[No. C015357. Third Dist. Aug. 7, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS HONIG III, Defendant and Appellant.

**COUNSEL**

Quin Denvir for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, and J. Robert Jibson, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**SPARKS, J.**—Defendant Louis (Bill) Honig III appeals from an order of probation entered after a jury found him guilty of four counts of making official contracts in which he had a financial interest in violation of Government Code sections 1090 and 1097. Defendant contends on appeal that the trial court erred in instructing the jury, in excluding certain evidence and in ordering restitution as a condition of probation. He further contends the transactions were grants rather than contracts and thus were beyond the scope of the charged crimes. Finally, he argues that the Attorney General lacked authority to prosecute this action. We conclude that the sentencing court erroneously believed that restitution was mandatory and consequently did not exercise its discretion in determining whether to impose such a condition. We shall set aside the restitution condition and remand the cause to the court for the purpose of exercising its discretion. In all other respects, we reject defendant's contentions and shall affirm the conviction and order of probation.

### FACTUAL BACKGROUND

In the General Election of November 1982, defendant was elected to the state constitutional office of Superintendent of Public Instruction. (Cal. Const., art. IX, § 2.) He assumed office in January 1983. Defendant was elected to a second term in the General Election of 1986 and took office for his second term in January 1987. The charges involved in this litigation concern contracts defendant caused to be made and performed by the Department of Education (DOE) in the years 1986 through 1989.[1] However, the charges are rooted in defendant's relationship with a nonprofit corporation known as the Quality Education Project, or QEP, which was established in 1982. The factual basis for the charges can best be understood by a chronological account of the significant events.

QEP was incorporated in December 1982 as a nonprofit corporation.[2] Defendant told Larry Tramutola, who was QEP's first significantly paid

---

[1]The charges against defendant were brought by indictment returned by the Sacramento County Grand Jury on March 24, 1992, after defendant had been reelected in the 1990 General Election and had commenced serving a third term. Although the statute of limitations for the charges in the indictment is three years, that period does not commence to run until discovery of the offense. (Pen. Code, §§ 801, 803, subd. (c).) The indictment alleged that discovery of the offenses occurred in December 1990. The parties agreed to submit the statute of limitations question to the court on stipulated evidence and the court found the indictment to have been brought in a timely manner. No issue is presented on appeal with respect to the timeliness of the prosecution.

[2]The prosecutor referred to QEP as "essentially a charitable trust operation" and the controller of QEP referred to it as a "501C3 organization." The Corporations Code recognizes

employee,[3] that he and his wife, Nancy Honig, started QEP before his election. Throughout the time period involved here QEP's corporate address was at the Honig residence. Nancy filed the periodic legal statements and reports required of a charitable corporation. (See, e.g., Gov. Code, § 12586; Corp. Code, §§ 6210, 6324, subd. (a).) The QEP report for 1982 reflected no income, no expenses, and did not set forth a general purpose for the corporation. Mitra Jazayeri, who lived at the Honig residence and volunteered her services as bookkeeper, testified that at the time there was no office or other facilities for the corporation.

In mid-1983 Tramutola, who made his living as an organizer for unions and similar entities, met with defendant and Nancy. He attended subsequent organizational meetings with the Honigs and others and ultimately was hired by Nancy to work for QEP.[4] Tramutola testified that at that time QEP was "[a]n organization looking for a mission to help improve schools." QEP did not yet have a product or a program and Tramutola's job was to go around the state meeting with people such as teachers, principals, parents, community activists, and occasional superintendents, to look at school improvement from an organizer's perspective.

In the course of his job Tramutola met Linda Page, who was then principal of an elementary school in Fremont. Initially Tramutola engaged Page in a discussion about school improvement generally, but their discussion soon focused on parental involvement. Parental involvement was a subject of particular interest to Page as she had been attempting to establish a program of parental involvement in her school. Following their initial meeting, Tramutola contacted Page frequently for her advice with respect to school improvement with particular emphasis on parental involvement.

For the 1983 calendar year QEP's annual report reflected income of $60,100 and expenses of $37,278. QEP identified its program services as

---

three types of nonprofit corporations: public benefit corporations, mutual benefit corporations, and religious corporations. (Corp. Code, §§ 5110 et seq., 7110 et seq., 9110 et seq.) From the record it is clear that QEP was incorporated as a nonprofit public benefit corporation. The QEP controller's reference to QEP as a 501C3 corporation obviously refers to the federal Internal Revenue Code, specifically title 26 United States Code section 501(c)(3), which exempts certain charitable corporations from income taxation.

[3]Nonprofit public benefit corporations are required to file annual charitable trust reports with the Attorney General and, at the time, these reports were required to identify employees who had received over $30,000 in wages. In its early years QEP may have received services from individuals who volunteered their time or who were compensated at levels that did not require that they be identified in reports, but Tramutola was the first QEP employee to be compensated at a level that required identification.

[4]It appears that Tramutola was compensated for his initial participation in the organization of QEP by defendant's campaign committee, known as the Quality Education Committee. Tramutola did not do any campaign work for defendant.

involving a public awareness program, public involvement in the education system, and business community participation. It appears, however, that by the end of 1983 Tramutola, at least, was beginning to focus on parental involvement as QEP's mission.

In early 1984 Tramutola began attempting to implement an experimental program of parental involvement in the Oakland school system. He described the program as experimental "in the sense that we were trying to learn how to do it, to learn to try to boil down a lot of—a lot of possibilities and things that were tangible that the average teacher and the average parent could do without changing their lives." While performing his job for QEP, Tramutola called Page for advice with increasing frequency and eventually, in the fall of 1984, Page asked to be compensated for her assistance. Tramutola relayed that request to Nancy. Thereafter defendant directed his staff to arrange a short-term consultant contract for the DOE to pay Page to work in the Oakland school system. The contract was in the amount of $8,500, which was the maximum permitted under state law for short-term contracts. The contract was arranged by defendant's executive office assistant and she believed that it was funded out of defendant's executive office account.

In its annual report for calendar year 1984, QEP reported income of $83,031 and expenses of $88,781. The report identified QEP's purposes as consisting of a public awareness program, speeches, public involvement in education systems, and business community involvement.

In mid-1985 Tramutola asked Page to work for QEP full time. She agreed and in order to do so she took a leave of absence from her duties in the Fremont Unified School District for the 1985-1986 school year. Tramutola and Page agreed that during the 1985-1986 school year Page would work for QEP exclusively. Tramutola testified that during the 1985-1986 school year the QEP program was still experimental but was getting close to becoming a formal or developed program. Page testified that QEP was at a conceptual or developmental stage without a set program, but that they were working toward that goal.

During the 1985-1986 school year Page worked primarily in Oakland, although she did not report to and was not supervised by anyone in the Oakland school system. She did no work in the Fremont Unified School District and did not report to anyone from that district. She had no contact with, nor reported to, anyone from the DOE. Tramutola testified that during that year Page reported to him and may have reported to Nancy with respect to some things. Page testified that she was directed by Tramutola and may

have received some instructions from Nancy only at the very end of the school year.

Tramutola did not know how Page was compensated during the 1985-1986 school year. Page did not participate in arranging her compensation and did not know what arrangements were made for her compensation. She knew, however, that her paycheck came from the Fremont Unified School District and that she was compensated at the same salary and benefit levels as she would have received as a principal in the Fremont Unified School District. In fact, defendant directed James Smith, the DOE deputy superintendent in charge of the curriculum and instructional leadership branch, to arrange a grant for the Fremont school district to pay Page's salary and benefits while she was on leave of absence during the 1985-1986 school year. Smith set up a grant from DOE to the Fremont district in the amount of $62,190 for the continuation of Page's salary and benefits.

QEP's annual report for the 1985 calendar year showed revenue of $221,330 and expenditures of $123,528. In that year Nancy was paid a salary of $25,000 by QEP.

By 1986 Page had become what Tramutola described as an important part of QEP. QEP began to develop a written protocol in the form of a resource manual and Tramutola said that Page played a major role in that endeavor. Tramutola said that a written resource manual was important to QEP on two levels: first, it would provide tangible things that people could do to try to improve schools; and second, it would assist in fundraising by providing something tangible to be shown to foundations and other prospective donors. Page agreed that a resource manual was important in that it would provide a product that could be shown to schools as the QEP program. In August 1986 Page and others engaged in a collaborative effort to put together a draft of a resource manual for the QEP program. The first draft was very rough or primitive and the development of the QEP resource manual remained a continuous endeavor for some time.

Tramutola left QEP's employ sometime in 1986. At that time Page was named director and began running the day-to-day operations of the QEP program. In the 1986-1987 school year QEP began hiring additional employees and this was one of Page's responsibilities. She placed advertisements in trade magazines advising interested parties to contact her as director of QEP. She conducted recruitment and interview activities and made decisions about who should be hired, subject to final approval by Nancy. The employees hired to perform field work for QEP during this time testified that they were hired by Page and regarded her as the boss.

During the first half of 1986 Page was paid by the Fremont Unified School District pursuant to the grant which had been arranged for the 1985-1986 school year. For the 1986-1987 school year Page took another leave of absence from her duties with the Fremont Unified School District and continued to work full time for QEP. She continued to receive a salary through the Fremont Unified School District at the salary and benefit levels she would have received as a principal. For the 1986-1987 school year defendant told Smith to make an arrangement with the Fremont Unified School District pursuant to which Page would continue to receive her Fremont compensation while working for QEP. At defendant's direction the DOE entered into contract No. 4127 with the Fremont Unified School District. Pursuant to the contract the DOE agreed to pay the Fremont district the sum of $69,882, which was the sum necessary for continuation of Page's salary and benefits. Although Page was named as "manager" in a cover letter, neither she nor QEP was identified in the contract itself. The written contract identified the Fremont Unified School District as the contractor. Pursuant to the contract the Fremont district agreed to perform development work in school improvement, and the contract work sheet stated that the contract was to be performed in the Fremont Unified School District. But the only thing the Fremont district was expected to do was to pass along the contract funds to Page by continuing to pay her salary and benefits. The Fremont district exercised no control over Page and neither Page nor any QEP employee did any work within the Fremont district. As before, the DOE did not exercise supervision or control over Page. In addition to her salary and benefits from the Fremont district, in the 1986-1987 school year Page began to receive supplemental payments from QEP. In the last half of 1986 these supplemental payments were in the amount of $500 per month.

QEP's annual report for the calendar year 1986 reported revenues of $277,438 and expenditures of $208,786. In that year Nancy was paid a salary of $48,000.

At the beginning of 1987 Page was given the title of executive director of QEP. During that year Page's supplemental payments from QEP were increased and QEP began paying rent to her for the use of her residence in QEP's business.[5] During the first half of 1987 Page was paid by the Fremont Unified School District under contract No. 4127. In early 1987 defendant directed his staff to extend contract No. 4127 for the 1987-1988 school year. The DOE and the Fremont Unified School District then entered into two

---

[5] Page testified that she began receiving $700 per month in rent from QEP in April 1987 and that her supplemental payments were increased to $2,000 per month during that year. QEP's records reflected that in addition to rent Page received $4,000 reported for income tax purposes on a W-2 form and $9,000 reported on a 1099 form.

amendments to contract No. 4127. The first amendment extended the term of the contract for an additional year, and the second amendment increased the contract sum by $3,232 to reflect salary increases that would be due Page as a principal in the Fremont district.

Daniel Rodriguez, an educator from Oregon who was hired by Page to work for QEP in 1987, testified that during that year the QEP program was still developmental and that the resource manual was "a living document" that they were adding to all the time. Page testified that by the 1987-1988 school year the key components of the QEP program had been clearly defined and they were in the process of refining the program. She said that the resource manual was being field tested and cleaned up in an effort "to get the bugs out of it." Eventually QEP copyrighted the resource manual.

During 1987 Page hired additional employees for QEP. Two of these employees are noteworthy here. Erical LaDawn Law was a principal in the Pasadena Unified School District who was hired by Page to work for QEP during the 1987-1988 school year. In order to work for QEP she took a leave of absence from the Pasadena Unified School District. During that year Law was compensated by QEP. Larry Perondi was an assistant principal in the Sweetwater Union High School District. Page asked Perondi to work for QEP and he initially declined but eventually agreed to work part time and was compensated by QEP on an hourly basis.

QEP's annual report for 1987 reflects revenue of $867,124 and expenses of $537,649. During that year Nancy received a salary of $63,000. Also during that year QEP began to pay rent for the offices in the Honig residence.

In 1988 QEP changed to a fiscal year reporting basis. The QEP report for the first six months of 1988 reflected revenue of $723,305 and expenses of $448,416. During that six-month period Nancy was paid a salary in the amount of $41,200. QEP continued to pay rent on the office space in the Honig residence at the rate of $1,000 per month. It also appears that during this period QEP began holding what would become annual retreats at the Honig winery, for which it paid $1,500 in rent.

Page continued to work for QEP in the 1988-1989 school year. However, she had encountered trouble getting the Fremont Unified School District to allow her to take a third consecutive leave of absence in the 1987-1988 school year and did not believe she would be allowed to take a fourth leave of absence, so she resigned from her duties in the Fremont Unified School District. Thereafter Page was compensated by QEP directly.

QEP was expanding in the 1988-1989 school year and Page hired new employees, subject to Nancy's final approval. The new employees included Perondi from the Sweetwater Union High School District, who took a leave of absence to work for QEP full time, and Antoinette Dunbar, who took a leave of absence from her duties as principal in the Pasadena Unified School District to work for QEP. Law took another leave of absence from the Pasadena Unified School District to continue working for QEP.

During the time that Perondi, Law and Dunbar were being hired for the 1988-1989 school year, Nancy told Page that if the state would pay for them it would save QEP a lot of money. Nancy later told Page that the state would pay for those employees and directed her to call Gaye Smoot at the DOE to make the arrangements. Smoot was an executive assistant to Deputy Superintendent Smith at the time. Defendant told Smith, who in turn told Smoot, to make arrangements for the DOE to pay the Sweetwater Union High School District and the Pasadena Unified School District for the continuation of the salaries and benefits of Perondi, Law and Dunbar for the 1988-1989 school year. The DOE entered into contract No. 5349 with the Sweetwater Union High School District pursuant to which the DOE paid the school district $62,755 for the payment of salary and benefits to Perondi while he worked with QEP. The DOE entered into contract No. 5356 with the Pasadena Unified School District pursuant to which the DOE agreed to pay $65,879 to the school district for the payment of salary and benefits to Law while she worked with QEP. Contract No. 5356 was subsequently amended to provide for the payment of an additional $65,879 for the payment of salary and benefits to Dunbar while she worked for QEP.

As had been the case with Page, neither the local school districts nor the DOE exercised any supervision over Perondi, Law or Dunbar during the 1988-1989 school year. It was made clear to these employees that they worked for QEP and they executed employee agreements with QEP. During the 1988-1989 school year Perondi did some work for QEP in the Sweetwater Union High School District and also worked in the South Bay and National School Districts, which he described as elementary districts that feed into the Sweetwater Union High School District. Law worked in Pomona and in the Archdiocese of Los Angeles, and Dunbar worked in Pomona and other districts. They did not work in the Pasadena Unified School District.

QEP's annual report for the 1988-1989 fiscal year reflected revenue of $1,011,074, and expenses of $1,209,454. During that year Nancy received a salary of $87,200 and benefits of $11,840, and the Honigs received office rental in the amount of $12,000.

Page left QEP's employment near the end of the 1988-1989 school year. In the 1989-1990 school year Perondi, Law and Dunbar remained in QEP's employ and were compensated by QEP rather than by DOE through their districts. In that fiscal year QEP reported revenues of $2,031,794 and expenses of $1,884,156. Nancy received a salary of $108,500 and benefits of $10,666, and the Honigs received office rental in the amount of $18,000.

Based upon these facts defendant was charged by indictment with four counts of violating Government Code sections 1090 and 1097, by participating in making state contracts in which he had a financial interest. Count one was based upon contract No. 4127, by which the DOE paid the Fremont Unified School District for the continuation of Page's salary and benefits while she worked for QEP during the 1986-1987 school year. Count two was based on the extension of contract No. 4127 for the payment of Page's salary and benefits while she worked for QEP during the 1987-1988 school year. Count three was based upon contract No. 5349, by which the DOE paid the Sweetwater Union High School District for the continuation of Perondi's salary and benefits while he worked for QEP during the 1988-1989 school year. Count four was based on contract No. 5356, by which the DOE paid the Pasadena Unified School District for the continuation of salaries and benefits to Law and Dunbar while they worked for QEP during the 1988-1989 school year.

In addition to the history of QEP and the contracts in question, the prosecution also established that the contracts at issue arose in an unusual manner. Rather than commencing by application or request and then proceeding through channels up DOE hierarchical levels for ultimate approval, these contracts arose at the highest level of authority. Defendant, as the Superintendent of Public Instruction and Director of Education,[6] instructed his staff to put the contracts in place. It does not appear that the contracts were initiated by any formal or written application or request; rather, they originated through defendant's oral directives to his DOE staff.

When the DOE makes grant money available, it is customary that school districts and other providers be notified by advertising or other means of the availability of the grant so that they may apply and compete for the funds. But there was no advertising or other notification associated with the contracts at issue here. In general when the DOE seeks to contract with an individual or private entity it is required to submit the proposed contract to public bidding or to obtain a sole-source exemption from the Department of

---

[6]The DOE is "conducted under the control of an executive officer known as the Director of Education." (Ed. Code, § 33302.) "The Superintendent of Public Instruction is ex officio Director of Education." (Ed. Code, § 33303.)

General Services. Since the contracts in question were made, at least nominally, between the DOE and local school districts they were exempt from these requirements and they were not accompanied by public bidding or a substitute process. However, although local school districts were named as contractors under the contracts, they were not expected to do anything other than to pay the contract funds, as salary and benefits, to individuals who would be working for QEP.

During the period in question there was within the DOE a budgeted parenting unit with responsibility over parental involvement activities. The DOE parenting unit did not participate in the contracts at issue. The proposed contracts were not submitted to that unit for its recommendation or approval, they were not prepared or executed by that unit, and that unit did not supervise or monitor the performance of the contracts. The contracts identified Smith, the deputy superintendent, as contract monitor, which was an unusual arrangement.[7] Neither Smith nor anyone else from DOE actually supervised or monitored the performance of the contracts.

During the period at issue here there were a number of organizations besides QEP which were involved in implementing parental involvement programs in schools. None of these organizations received grants, contracts, or other forms of assistance like those provided to QEP. Defendant offered the explanation that QEP was donating resources while the other organizations were not. The record does not show how other organizations operated, but it does establish that QEP did not charge school districts for its services. QEP's revenues were derived from donations, grants, and private funding as a result of what was termed a massive fundraising effort with Nancy as chief fund-raiser.[8]

Although defendant was not officially involved in QEP, the record is replete with evidence of his informal involvement. He told Tramutola that he and Nancy had started QEP. Tramutola was compensated for participation in early organizational meetings by defendant's campaign committee, the quality education committee. Defendant participated in the early organizational meetings. As the enterprise developed, QEP's corporate headquarters were

---

[7]The DOE contracts officer testified that a contract monitor is responsible for such things as ensuring that the work is performed, that it is performed in accordance with the contract specifications, that it is performed in a timely manner, and that invoices are accurate. Smith performed none of these functions.

[8]Eventually QEP began to promote its programs beyond the confines of the California public school system. For example, there was evidence that Law worked in the Archdiocese of Los Angeles and that Law, Dunbar and other QEP employees traveled out of the state to promote the QEP program. The record does not state whether QEP sought compensation for its services when it promoted its program beyond the California public school system.

in defendant's residence and his wife was chief corporate officer. Defendant would, on occasion, attend QEP meetings. Defendant participated in Nancy's fundraising efforts. And he touted QEP's program to educators from other states.

Based upon this evidence defendant was found guilty of the four counts charged in the indictment. He appeals from the subsequent order granting him probation. (Pen. Code, § 1237, subd. (a).)

## DISCUSSION

We begin with the statutory definitions of the charged crimes. Government Code section 1090 provides: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity. [¶] As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental proprietary functions within limited boundaries." (Unless otherwise specified, further section references are to the Government Code.)

Section 1097 provides: "Every officer or person prohibited by the laws of this state from making or being interested in contracts, or from becoming a vendor or purchaser at sales, or from purchasing scrip, or other evidences of indebtedness, including any member of the governing board of a school district, who willfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

Before we turn to defendant's contentions on appeal, we recount the purpose, scope and application of these conflict-of-interest statutes. We caution at the outset, however, that many of the cited cases are civil rather than criminal. Moreover, some of these cases preceded the 1963 addition of the term "financially" to section 1090 and the 1955 addition of the term "willfully" to section 1097. Consequently these cases are not controlling on the scienter or mental state at issue here or on interests which are not financial in nature. Nevertheless, they are instructive on the construction and interpretation of other elements of these statutes.

The conflict-of-interest statutes are based upon "[t]he truism that a person cannot serve two masters simultaneously" (*Thomson* v. *Call* (1985)

38 Cal.3d 633, 637 [214 Cal.Rptr. 139, 699 P.2d 316]), which is regarded as a "self-evident truth, as trite and impregnable as the law of gravitation . . . ." (*Stockton P. & S. Co.* v. *Wheeler* (1924) 68 Cal.App. 592, 601 [229 P. 1020].)

The duties of public office demand the absolute loyalty and undivided, uncompromised allegiance of the individual that holds the office. (*Thomson* v. *Call, supra*, 38 Cal.3d at p. 648; *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289].) Yet it is recognized " 'that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government.' " (*Stigall* v. *City of Taft, supra*, 58 Cal.2d at p. 570, quoting *United States* v. *Mississippi Valley Generating Co.* (1961) 364 U.S. 520, 549-550 [5 L.Ed.2d 268, 288, 81 S.Ct. 294].) Consequently, our conflict-of-interest statutes are concerned with what might have happened rather than merely what actually happened. (*Ibid.*) They are aimed at eliminating temptation, avoiding the appearance of impropriety, and assuring the government of the officer's undivided and uncompromised allegiance. (*Thomson* v. *Call, supra*, 38 Cal.3d at p. 648.) Their objective "is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision . . . ." (*Stigall* v. *City of Taft, supra*, 58 Cal.2d at p. 569, italics in original; see also *People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 865 [136 Cal.Rptr. 429]; *People* v. *Watson* (1971) 15 Cal.App.3d 28, 39 [92 Cal.Rptr. 860].)

█ In view of the purposes of our conflict-of-interest statutes, it is well established that their scope is not limited to instances of actual fraud, dishonesty, unfairness or loss to the governmental entity, and criminal responsibility is assessed without regard to whether the contract in question is fair or oppressive. (*People* v. *Darby* (1952) 114 Cal.App.2d 412, 426-427 [250 P.2d 743].) Thus, it has been repeatedly held that such matters are irrelevant under section 1090. (*Thomson* v. *Call, supra*, 38 Cal.3d at pp. 648-649; *People* v. *Vallerga, supra*, 67 Cal.App.3d at p. 865; *People* v. *Watson, supra*, 15 Cal.App.3d at p. 39.)

In enacting the conflict-of-interest provisions the Legislature was not concerned with the technical terms and rules applicable to the making of contracts, but instead sought to establish rules governing the conduct of governmental officials. (*Stigall* v. *City of Taft, supra*, 58 Cal.2d at p. 569.) Accordingly, those provisions cannot be given a narrow and technical interpretation that would limit their scope and defeat the legislative purpose. (*Id.* at pp. 569, 571; *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 237 [69 Cal.Rptr. 251].) Thus, in

*Stigall* v. *City of Taft, supra,* where a member of the city council participated in preliminary matters leading to the adoption of a contract but resigned before the formal award of the contract, the court refused to construe the word "made" in a narrow and technical sense and instead held that it encompassed the planning, preliminary discussion, compromises, drawing of plans and specifications and solicitation of bids that led up to the formal making of the contract. (58 Cal.2d at p. 571; see also *Thomson* v. *Call, supra,* 38 Cal.3d at pp. 644-645 [successive contracts were considered part of a single multiparty agreement for purposes of section 1090].)

■ In a similar vein, the term "financially interested" in section 1090 cannot be interpreted in a restricted and technical manner. The law does not require that a public officer acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, nor does it require that the officer share directly in the profits to be realized from a contract in order to have a prohibited interest in it. (*People* v. *Vallerga, supra,* 67 Cal.App.3d at p. 865; *People* v. *Darby, supra,* 114 Cal.App.2d at p. 425.) Rather, "[t]he instant statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the [state]." (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569.) The fact that the officer's interest "might be small or indirect is immaterial so long as it is such as deprives the [state] of his overriding fidelity to it and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good." (*Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 207-208 [300 P.2d 119].) And, "[w]e must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. [Citation.] However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established." (*People* v. *Watson, supra,* 15 Cal.App.3d at p. 37.)

■ Moreover, prohibited financial interests are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances. (*Thomson* v. *Call, supra,* 38 Cal.3d at p. 645; *People* v. *Deysher* (1934) 2 Cal.2d 141, 150 [40 P.2d 259]; *People* v. *Vallerga, supra,* 67 Cal.App.3d at p. 867; *People* v. *Darby, supra,* 114 Cal.App.2d at p. 430.)

The types of financial interests prohibited by section 1090 are many and varied. We cite only a few representative samples. In *Nielsen* v. *Richards*

(1925) 75 Cal.App. 680 [243 P. 697], the county superintendent of schools entered into a contract appointing his wife as supervising teacher of rural schools with a salary and expenses. The Court of Appeal concluded that, in view of the mutual obligations of support inherent in a marriage, the superintendent had an interest in the contract even though he had previously agreed that any money earned by his wife under the contract would be her separate property. (*Id.* at pp. 687, 691.)

In *Moody* v. *Shuffleton* (1928) 203 Cal. 100 [262 P. 1095], a county supervisor sold his printing and publishing business to his son and took a promissory note secured by a chattel mortgage in payment. The son then obtained county printing contracts. The Supreme Court held that since the printing contracts could serve to enhance the value of the business, and hence the security of the chattel mortgage, the supervisor had a conflict of interest with respect to the printing contracts. (*Id.* at p. 105.)

In *People* v. *Darby, supra,* 114 Cal.App.2d 412, the defendant member of a local board of education leased his commercial property at a generous rental to an individual who, it could be inferred, acted as an agent for a partnership engaged in the ice cream business. The defendant then participated in official actions that resulted in the partnership's securing a portion of the district's ice cream business. The defendant's interest as landlord in the partnership's permanency as a tenant of his property was held to be a prohibited interest under our conflict-of-interest laws. (*Id.* at pp. 429-430.)

In *People* v. *Watson, supra,* 15 Cal.App.3d 28, the defendant member of the board of harbor commissioners loaned money to an individual for the purchase of a liquor license which the individual planned to use in connection with a floating restaurant operated by his solely owned corporation. The defendant then participated in the decision to grant the corporation a lease for a harbor berth. The court concluded that the lease would enhance the security for the defendant's loan and facilitate its prompt repayment, and was thus a prohibited financial interest under section 1090. (15 Cal.App.3d at p. 37.)

In *People* v. *Vallerga, supra,* 67 Cal.App.3d 847, the defendant county assessor participated with the former county assessor in demonstrations and meetings by which an assessor from another state was convinced to purchase the county's computer appraisal program from the county. The former county assessor was paid $6,000 as a consultation fee upon execution of the purchase and he paid $3,000 to the county assessor for his participation. Although the out-of-state assessor had agreed to pay only the former assessor, and the former assessor testified that he had just decided to split the

payment and that there had been no understanding whatsoever to pay the county assessor, the court held that the evidence was sufficient to permit the jury to infer a promise to split the fee and that this was a prohibited financial interest under section 1090. (67 Cal.App.3d at p. 867.)

In *Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201 [137 Cal.Rptr. 118], a member of the county board of supervisors was a partner and, upon incorporation, a shareholder in an insurance agency that acted as agent in the procurement of insurance for the county. Although the county supervisor did not share in the commissions from the county's business and those commissions were not used to defray the agency's overhead, the court concluded that he had a financial interest within the meaning of section 1090 because he "has and has had an investment in the agency represented by his partnership and shareholder interests. His interest in the agency and in any contracts from which it derives a pecuniary benefit is clearly a financial one because the financial success of the agency inures to his personal benefit. Such success, in turn, enhances the value of [his] interest in the agency." (68 Cal.App.3d at p. 215.)

In addition to the judicial authorities interpreting section 1090, a significant indication of legislative intent with respect to the scope of section 1090 can be derived by reference to sections 1091 and 1091.5. Section 1090, it has been said, is an embodiment of the common law with respect to conflicts of interest. (*Stockton P. & S. Co.* v. *Wheeler, supra,* 68 Cal.App. at p. 597.) The courts construed that provision broadly to include any interest, "other than perhaps a remote or minimal interest," which might influence official duty. (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569.) In sections 1091 and 1091.5, the Legislature has provided for remote and minimal interests which will not be deemed to be interests within the prohibitive scope of section 1090.

Section 1091 applies to an officer who is a member of a body or board that authorizes, approves or ratifies a contract. Such an officer will not be deemed to be interested in a contract if his or her interest is one of the remote interests set forth in the section, the officer makes full disclosure of the interest, the officer abstains from voting, the officer does not influence or attempt to influence any other member, and the body or board authorizes, approves or ratifies the contract in good faith by a vote of its membership sufficient for that purpose without counting the vote of the officer with the remote interest. Section 1091 is not arguably applicable here since, among

other things, defendant did not disclose his interest in the contracts at issue and personally made the decision to create the contracts.[9]

Section 1091.5 provides a list of interests which, based upon the quantity and quality of the interest and the officer's relationship to the contracting party, are not to be deemed to be prohibited interests within the meaning of section 1090. The list of such interests, which may be termed minimal interests, includes the relationship of landlord and tenant only in limited circumstances which are not applicable here. (§ 1091.5, subd. (a)(4).) The list includes the interest of an officer in a spouse's employment only where the spouse is an officer or employee of a public agency and has held that position for at least one year prior to the officer's election or appointment. (§ 1091.5, subd. (a)(6).) The list also provides that under certain circumstances, and provided full disclosure is made, an officer's interest as a nonsalaried member of a nonprofit corporation or as a noncompensated officer of certain nonprofit, tax-exempt corporations will not be deemed an interest under section 1090. (§ 1091.5, subd. (a)(7) & (8).) Neither these nor any of the other minimal interests set forth in section 1091.5 are arguably applicable in this case.

While the provisions of sections 1090 and 1097 have remained relatively static with few amendments over the years, the Legislature has not been idle. The Legislature has, where it deemed appropriate, altered the scope of section 1090 by amending sections 1091 and 1091.5. For example, in response to the determination that a parent is interested in the earnings of a minor child for personal services (5 Ops.Cal.Atty.Gen. 6 (1945)), the Legislature added subdivision (b)(4) to section 1091, to classify that interest as a remote interest which will not violate section 1090 if the interested officer complies with the disclosure and abstention requirements of section 1091. After the decision in *Fraser-Yamor Agency, Inc.* v. *County of Del Norte, supra,* 68 Cal.App.3d 201, the Legislature amended section 1091 to classify as a remote interest the interest of an owner, officer, employee or agent of a firm which provides stockbroker, insurance or real estate services, provided the individual has not and will not receive remuneration, consideration, or a

---

[9]The list of remote interests set forth in section 1091 includes the interest of a parent in the earnings for personal services of a minor child but does not include the interest of an officer in the earnings of a spouse. (§ 1091, subd. (b)(4).) However, the list does include the interest of an officer or employee of a nonprofit corporation and inferentially would include the interest of the spouse of an officer or employee of such a corporation. (§ 1091, subd. (b)(1).) It also includes the interest of a landlord or tenant of the contracting party. (§ 1091, subd. (b)(5).) However, here defendant personally made the decision to make the contracts and did so over the objections of his staff. He did not disclose to his staff that his spouse was compensated by QEP. Moreover, during the period of time defendant made the decisions to make the contracts in question he did not report his interest in Nancy's income from QEP in his annual statements to the Fair Political Practices Commission.

commission as the result of the contract. (§ 1091, subd. (b)(6).) Among other things, the Legislature has classified the interest of an officer or employee of a nonprofit corporation and the interest of a landlord or tenant of the contracting party as remote interests. (§ 1091, subd. (b)(1) & (5).) And, as we have noted, the Legislature has classified as minimal interests under section 1091.5, an interest in a spouse's employment if the employment is with a public agency and has existed at least one year prior to the officer's election or appointment, the interest of a nonsalaried member of a nonprofit corporation, and the interest of a noncompensated officer of certain nonprofit, tax-exempt corporations. (§ 1091.5, subd. (a)(6), (7) & (8).)

In light of the scope of section 1090, we find the evidence in support of defendant's convictions to be ample, even compelling. As we shall explain, he was clearly financially interested in Nancy's employment and remuneration by QEP, as well as in the rental payments from QEP to the Honigs jointly. As we have noted, it has long been held that a person's interest in a spouse's employment and income is an interest within the meaning of section 1090. Although the Legislature has acted to exclude an interest in a spouse's employment from the scope of section 1090 in certain limited circumstances, those circumstances are not arguably applicable here. (§ 1091.5, subd. (a)(6).) It makes no difference that QEP was a nonprofit corporation, since a position as a member or officer of a nonprofit corporation is excluded from section 1090 only when the position is nonsalaried or noncompensated and may be treated as a remote interest only if the disclosure and abstention requirements of section 1091.5 are met. (§§ 1091, subd. (b)(1), 1091.5, subd. (a)(7) & (8).) And an interest as a landlord may be treated as remote only with disclosure and abstention. (§ 1091, subd. (b)(5).)

Defendant's interest was clearly substantial. QEP began as a mere shell corporation shortly after defendant's election and, during his incumbency, grew into a substantial nonprofit organization with millions of dollars of revenue. Nancy was the chief administrative officer of QEP and, as QEP grew, Nancy began to receive substantial and annually escalating compensation in the form of salary and benefits and the Honigs jointly received substantial and escalating rental payments for the corporate offices in their residence. In addition, it would be reasonably likely that QEP's growing success during the periods in which defendant was providing assistance through DOE contracts would not only inure to his immediate benefit but could provide a source of substantial family income into the indefinite future.

The fact that various school districts were the nominal parties contracting with the DOE does not diminish the force of the evidence. Before the

contracts at issue were made by the DOE, the individuals involved, Page, Perondi, Dunbar and Law, were hired by QEP to work for QEP. They executed employment agreements with QEP, reported solely to QEP, and performed only QEP's work. All of the indicia of employment, save only the source of funding for their compensation,[10] point to QEP as their employer. In considering conflicts of interest we cannot focus upon an isolated "contract" and ignore the transaction as a whole. (*Thomson* v. *Call*, *supra*, 38 Cal.3d at pp. 644-645.) It appears clear that the payment of DOE funds to the school districts, the districts' payment of those funds to QEP employees in the form of continued salaries and benefits, and the employees' work for QEP, were in performance of single multiparty agreements. (*Id.* at p. 644.) In short, defendant simply used the school district contractors as conduits to funnel DOE funds to individuals as compensation for working for his wife's corporate employer. The use of a third party as a contractual conduit does not avoid the inherent conflict of interest in such a transaction. (*Id.* at p. 646.)

The fact that QEP did not charge a fee to the districts in which it operated does not exonerate defendant. As we have recounted, in considering alleged conflicts of interest we will look behind the veil which enshrouds the activities of the parties and will find a conflict if the officer is connected to a forbidden transaction, however devious and winding the trail may be. (*People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 37.) Actually, the trail here is not all that devious and winding. QEP did not derive its revenue from school districts, but instead engaged in what was called a massive fundraising effort with Nancy as the primary fund-raiser and with the significant participation of defendant. Without a purpose or a program and without workers in the field attempting to implement the program, QEP's fundraising efforts would have been severely inhibited and could even have become unlawful. (See § 12580 et seq.; Corp. Code, §§ 6321-6324, 6812.) Thus QEP had to have some workers involved in the field implementing some program in order to maintain its very existence. As QEP established itself and grew, both in terms of its purpose and program and in terms of its assets and revenue through fundraising, Nancy received substantial and continuously escalating salary and benefit payments and the Honigs jointly received substantial and escalating rental payments. During this same period defendant directed his staff to arrange contracts by which DOE funds would be used to pay QEP employees to work for QEP, thus saving QEP the expense. The conflict

---

[10]In Page's case, as her role and responsibilities with QEP increased, it was agreed that she should be entitled to greater compensation and QEP made up the difference through supplemental wage payments and rental payments for the use of her residence for QEP business. However, during the period in question the bulk of Page's compensation was paid by the DOE through the Fremont Unified School District.

of interest inherent in that situation is not particularly difficult to perceive. By relieving QEP of the burden of paying its own employees, more funds were available to pay the salary of defendant's wife and the rent for the use of defendant's home. The violations of sections 1090 and 1097 are established by the fact of defendant's financial interest in QEP at the time he made official contracts that directly benefited QEP and indirectly benefited himself and his wife. No plausible explanation or excuse has been advanced to avoid the impact of those facts.[11]

In view of the applicable law and the evidentiary facts established, we must disagree with defendant's assessment of the case against him. In his opening brief defendant asserts that the benefits derived by QEP and the Honigs from the contracts at issue were remote, unmeasured, incidental and speculative. Defendant refers to the charges as unique and unprecedented and suggests that the evidence was barely, if at all, sufficient. To the contrary, we find the evidence to be relatively straightforward and overwhelming. In the light of the law governing the conflict-of-interest statutes we have just recounted at some length, we turn to defendant's specific contentions on appeal.

## I. *Jury Instructions*

Defendant launches a series of appellate attacks on the jury instructions. He first contends that reversal is required because the trial court failed to instruct the jury as to one element of the charged offense and totally misinstructed the jury as to a second element. In his view, the prohibited financial interest must have a foreseeable material effect on the public officer's source of income and thus the court erred in failing to instruct on

---

[11]In fact, the Legislature has contemplated situations like that involving QEP, the DOE, and defendant. In providing a list of minimal interests that do not violate section 1090, the Legislature included: "That of a noncompensated officer of a nonprofit, tax-exempt corporation, which, as one of its primary purposes, supports the functions of the body or board or to which the body or board has a legal obligation to give particular consideration, and provided further that such interest is noted in its official records." (§ 1091.5, subd. (a)(8).) The Legislature did not choose to exclude from the reach of section 1090 situations in which an officer and/or his or her spouse are compensated by such an organization, although in such circumstances the interest may be treated as remote within the meaning of section 1091 if the officer complies with the disclosure and abstention requirements of that section. (§ 1091, subd. (b)(1).) The maxim *expressio unius est exclusio alterius* (expression of one thing is the exclusion of another) is a rule of statutory construction pursuant to which an express statutory exception to a general rule, by necessary implication, precludes other exceptions. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537]; *People* ex rel. *Cranston* v. *Bonelli* (1971) 15 Cal.App.3d 129, 135 [92 Cal.Rptr. 828].) In short, we cannot exclude defendant's conduct from the reach of section 1090 when the Legislature has considered the situation and enacted an exclusion far more limited than it would take to exclude defendant.

the element of materiality. Defendant further contends the court's instruction that the phrase "financially interested" included "the contingent possibility of monetary or proprietary benefit," and "actual or potential pecuniary benefits directly or indirectly to the state officer," erroneously lowered the standard from a probability to a mere possibility that the contracts in question would have any financial effect on defendant. Neither contention is meritorious.

## A. *The Measure of Financial Interest*

In instructing the jury the court defined the charged offenses in accordance with sections 1090 and 1097 as follows: "Any state Officer who, acting in his official capacity, who willfully makes or causes to be made a contract in which he has a financial interest is guilty of a violation of Government Code sections 1090 and 1097. [¶] In order to prove such a crime, each of the following elements must be proved: [¶] (1) that the person is a state officer; [¶] (2) that the person acted in his official capacity; [¶] (3) that the person knowingly; and [¶] (4) willfully made or caused to be made a contract in which he had a financial interest." The court further instructed on the definitions of knowingly and willfully in accordance with the standard CALJIC instructions and gave a special instruction defining a contract.[12] The court also instructed the jury that the prosecution did not have to prove fraud, dishonesty or loss, or that the contracts were unfair, unjust or inequitable, and that it was not a defense that there was no actual fraud, dishonesty or loss or that the contract was just, fair and equitable.

With respect to prohibited financial interests the court instructed: "The phrase 'financially interested' as used in Government Code section 1090 means any financial interest which might interfere with a state officer's unqualified devotion to his public duty. The interest may be direct or indirect. It includes any monetary or proprietary benefit, or gain of any sort or the contingent possibility of monetary or proprietary benefits. The interest is direct when the state officer, in his official capacity, does business with himself in his private capacity. The interest is indirect when the state officer,

---

[12]These instructions read: "The word 'knowingly' means with knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required. [A requirement of knowledge does not mean that the act must be done with any specific intent.]" (CALJIC No. 1.21 (5th ed. 1988 bound vol.) (hereafter CALJIC No. 1.21).) "The word 'willfully' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage." (CALJIC No. 1.20 (5th ed. 1988 bound vol.).) "The term 'contract,' as used in the foregoing instruction, means an agreement to do or not to do a certain thing. The essential elements of a contract are: [¶] 1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and [¶] 4. A sufficient cause or consideration." (Special instruction No. 2.)

or agency he directs, enters into a contract in his or its official capacity with an individual or entity, which individual or entity, by reason of the state officer's relationship to the individual or entity at the time the contract—at the time the contract is entered into, is in a position to render actual or potential pecuniary benefits directly or indirectly to the state officer based on the contract the individual or entity has received." This instruction has been judicially approved for use in prosecutions for violations of sections 1090 and 1097. (*People* v. *Darby, supra,* 114 Cal.App.2d at pp. 433-436, especially fn. 4; see also *People* v. *Vallerga, supra,* 67 Cal.App.3d at p. 867; *People* v. *Watson, supra,* 15 Cal.App.3d at pp. 37-38.)

The court also instructed: "An official has a financial interest in a contract within the meaning of Government Code section 1090 if it is reasonably foreseeable that the contract may have a financial affect [*sic*], distinguishable from its affect [*sic*] on the public generally, on any source of income of the official." This instruction was based upon a special instruction initially requested by defendant with which the court disagreed. The instruction as originally requested provided: "An official has a financial interest in a contract within the meaning of Government Code section 1090 if it is reasonably foreseeable that the contract will have a material financial effect, distinguishable from its effect on the public generally, on any source of income of the official." When the trial court indicated that it would not give the instruction as requested, defendant modified it to the form in which it was given.

■■■ Defendant contends that the compelled modification of his requested instruction was erroneous in that it substituted "may have" for "will have" and omitted the qualifying word "material." In defendant's view, to be financially interested in a contract within the meaning of section 1090 it must be reasonably foreseeable that the contract will have a financial effect on a source of income of the official and the effect must be material, meaning "a financial effect of real importance or great consequence," or "a significant effect on a source of income."

We reject defendant's suggested interpretation of section 1090. This section has long been interpreted as prohibiting an official from having any financial interest in a contract, whether direct or indirect. (See *Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569.) Although the Legislature amended the statute in 1963 to clarify that it was concerned with financial interests,[13] the Legislature has never seen fit to qualify the proscribed financial interests

---

[13]In its original form section 1090 prohibited an official from being "interested" in a contract. In a report the Assembly Interim Committee on Government Organization presumed that the statute proscribed financial interests but recommended that it be amended to specif-

with modifiers such as "material," "substantial," "significant," or "direct," "certain," "probable," and the like. (See *People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 34, fn. 1.)

The adoption of defendant's suggested interpretation of section 1090 would go a long way toward evisceration of the statute's prophylactic purpose. In *United States* v. *Mississippi Valley Generating Co.*, *supra*, 364 U.S. 520 [5 L.Ed.2d 268], in a decision our state courts have often relied upon, the United States Supreme Court considered a federal conflict-of-interest statute similar to section 1090. There the high court noted that the federal statute was preventative in nature and was aimed at what might have happened rather than what actually happened. (364 U.S. at p. 549-550 [5 L.Ed.2d at p. 288].) Its purpose was to eliminate temptation and to this end spoke in broad, absolute terms, thus establishing "an absolute standard of conduct." (*Id.* at pp. 550, 559 [5 L.Ed.2d at pp. 288-289, 294].) The court rejected a contention that the agent in that case was not "interested" in the government contract at issue because his firm had no more than a mere hope that it would receive future financing work as a result of the government contract. By the "logic of circumstances" the agent's firm might be offered financing work if the government contract were made and these circumstances placed the agent "in the ambivalent position at which the statute is aimed." Since the contract sponsors were in a position to affect the fortunes of the agent and his firm, he would be at least subconsciously tempted to ingratiate himself by acceding to their demands, and by placing himself in this "ambiguous situation," the agent failed to honor the objective standard of conduct required by the statute. (*Id.* at p. 557 [5 L.Ed.2d at pp. 292-293]. See also *Thomson* v. *Call*, *supra*, 38 Cal.3d at pp. 644-645.)

██ Section 1090, like the federal statute at issue in *United States* v. *Mississippi Generating Co.*, *supra*, establishes an objective and absolute standard of conduct for public officials. In this context the California Supreme Court long ago noted: " 'For even if the honesty of the agent is unquestioned, and if his impartiality between his own interest and his principal's might be relied upon, yet the principal has in fact bargained for the exercise of all the skill, ability, and industry of the agent, and he is entitled to demand the exertion of all this in his own favor.' " (*San Diego* v. *S. D. & L. A. R. R. Co.* (1872) 44 Cal. 106, 113.) For over a hundred years our courts have consistently held that our conflict-of-interest statute, now embodied in section 1090, is intended to enforce the government's right to the absolute, undivided, uncompromised allegiance of public officials by

ically proscribe financial interests. (12 Assem. Interim Com. Rep. (1961-1963) No. 6, p. 9; see *People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 34, fn. 1.) That recommendation was followed in 1963. (Stats. 1963, ch. 2172, § 1, pp. 4559-4560.)

proscribing any personal interest. (See *Thomson* v. *Call*, *supra*, 38 Cal.3d at p. 648; *Stigall* v. *City of Taft*, *supra*, 58 Cal.2d at p. 569.) To this preventative end, section 1090 establishes a broad, objective proscription which is violated when an official places himself in an "ambivalent position" or an "ambiguous situation," by having any financial interest in an official contract, and which does not depend upon the actuality of a personal influence on his decisions.

What is material to some persons may be regarded as immaterial by others and some public officials may be tempted by relatively trivial sums while others may be incorruptibly resistant to the promise of even significant gain. But section 1090 is not directed at the actuality of significant personal influence; it is instead directed at the mere possibility of any such influence. (*Stigall* v. *City of Taft*, *supra*, 58 Cal.2d at p. 569.) To engraft onto the statute by judicial fiat relative terms such as material, substantial, significant and the like, would make the standard less than absolute, would inject questions of actuality of improper influence into its application, and would open the door to official contracting from the "ambivalent position[s]" and "ambiguous situation[s]" which the statute seeks to prevent. Such a result would be contrary to the terms of the statute and to the long-standing judicial interpretation of those terms and we perceive no reason to undertake such a fundamental reconstruction of the statute.

We also reject defendant's assertion that the court erred in requiring him to modify his instruction to require that it be reasonably foreseeable that the contract "may have" rather than "will have" a financial effect on a source of income. The government's right to the absolute, undivided allegiance of a public officer is diminished as effectively where the officer acts with a hope of personal financial gain as where he acts with certainty. (*People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 38; *People* v. *Darby*, *supra*, 114 Cal.App.2d at p. 435.) Accordingly, our courts have long rejected assertions that the scope of section 1090 is limited to direct or certain profits. (*Thomson* v. *Call*, *supra*, 38 Cal.3d at p. 644; *People* v. *Vallerga*, *supra*, 67 Cal.App.3d at p. 865; *People* v. *Darby*, *supra*, 114 Cal.App.2d at pp. 425, 435.) The trial court properly instructed the jury that a financial interest within the meaning of section 1090 may be direct or indirect and includes the contingent possibility of monetary or proprietary benefits. (*People* v. *Vallerga*, *supra*, 67 Cal.App.3d at p. 865; *People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 37; *People* v. *Darby*, *supra*, 114 Cal.App.2d at p. 435.) The court was not required to contradict this instruction by interjecting questions of directness and certainty that find no place in the statute or decisional authorities.

Defendant asserts that his requested instruction, in its original form, was adapted from section 87103, a part of the Political Reform Act of 1974

(§ 81000 et seq., hereafter referred to as the PRA), and inferentially claims that the PRA definition must be regarded as having superseded prior judicial constructions of section 1090.[14] Indeed, his whole argument that the prohibited interest in the charged crimes must have a material financial effect on the income of the official or his family rests on the claim that the PRA statutes are in pari materia with the charged conflict-of-interest statutes. From this premise, defendant reasons that the phrase "financially interested" in section 1090 must be given the same definition as "financial interest" in section 87103 of the PRA, which requires a foreseeably "material financial effect" on the official or his family.[15] Consequently, so his argument goes, section 1090 must be construed to mean the contract in question must

---

[14]At the time of trial, section 87103 provided: "An official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official or a member of his or her immediate family or on: [¶] (a) Any business entity in which the public official has a direct or indirect investment worth one thousand dollars ($1,000) or more. [¶] (b) Any real property in which the public official has a direct or indirect interest worth one thousand dollars ($1,000) or more. [¶] (c) Any source of income, other than gifts and other than loans by a commercial lending institution in the regular course of business on terms available to the public without regard to official status, aggregating two hundred fifty dollars ($250) or more in value provided to, received by or promised to the public official within 12 months prior to the time when the decision is made. [¶] (d) Any business entity in which the public official is a director, officer, partner, trustee, employee, or holds any position of management. [¶] (e) Any donor of, or any intermediary or agent for a donor of, a gift or gifts aggregating two hundred fifty dollars ($250) or more in value provided to, received by, or promised to the public official within 12 months prior to the time when the decision is made. [¶] For purposes of this section, indirect investment or interest means any investment or interest owned by the spouse or dependent child of a public official, by an agent on behalf of a public official, or by a business entity or trust in which the official, the official's agents, spouse, and dependent children own directly, indirectly, or beneficially a 10-percent interest or greater." (Stats. 1985, ch. 611, § 1.5, p. 2179.)

Section 87103 provides a general definition of "financial interest" measured by an effect on an officer or his or her immediate family, and then provides a specific list of persons, entities and interests upon which a financial effect will be deemed to be an effect on the officer, thus rendering the officer financially interested, regardless of its specific effect on the officer or his family. The list includes, in subdivision (c), an effect on any source of income in the aggregate sum of $250 or more. QEP was a source of income for defendant, both in terms of his community interest in Nancy's salary and benefits and in terms of the substantial rental payments it made to the Honigs jointly. The use of DOE funds to pay QEP employees, thus sparing QEP the expense, unquestionably had a material financial effect on QEP. Accordingly, if the jury had been fully instructed in terms of section 87103, it would have had no choice but to find defendant to be guilty. The instruction requested by defendant jettisoned the unfavorable portions of section 87103 while retaining the portions that might have been favorable through diminishment of the absolute and objective standard of section 1090. Even if we agreed with defendant that section 87103 has relevance in a prosecution under sections 1090 and 1097, we would not sanction an instruction that only partially reflects the definition of a financial interest set forth in section 87103.

[15]In addition to the PRA statutes themselves, there are several regulations defining a "material financial effect" in various contexts. These are to be found in title 2, California Code of Regulations, section 18702 et seq.

"have a foreseeable material effect on a public official's source of income before the official is deemed to be financially interested in the contract." (Italics omitted.) The claim cannot withstand scrutiny.

■ The phrase "in pari materia" means " '[o]f the same manner; on the same subject' " (*Altaville Drug Store, Inc.* v. *Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4 [242 Cal.Rptr. 732, 746 P.2d 871]), and the rule of statutory construction governing statutes in pari materia describes a process of interpretation by reference to related statutes. "Other statutes dealing with the same subject as the one being construed—commonly referred to as statutes in pari materia—comprise another form of extrinsic aid useful in deciding questions of interpretation. However, in line with the basic rule on the use of extrinsic aids, other statutes may not be resorted to if the statute is clear and unambiguous." (2B Sutherland, Statutory Construction (5th ed. 1992) § 51.01, p. 117.)[16]

" 'Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons [or] things, or have the same purpose or object. Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other.' " (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 [253 Cal.Rptr. 1, 763 P.2d 852], quoting 2A Sutherland, Statutory Construction (4th ed. 1984) § 51.03, p. 467.) ■ Section 1090 and section 87100 of the PRA are two of the most important statutes in California addressing the problem of conflict of interest by public officials and employees. They both deal with a relatively small class of people, public officers and employees, and share the same purpose or objective, the prevention of conflicts of interests, and hence can fairly be said to be in pari materia. (See 65 Ops.Cal.Atty.Gen. 41, 57 (1982).)

■ When statutes are in pari materia, they should be construed together as one statute. (*City of Huntington Beach* v. *Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) So interpreted, ". . . all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others." (*Ibid.*)

[16]There is authority for the proposition that the rule of in pari materia applies "only where the statute, taken alone, is ambiguous or unclear." (*Guelfi* v. *Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d 297, 307 [193 Cal.Rptr. 343]; accord, *San Miguel Consolidated Fire Protective Dist.* v. *Davis* (1994) 25 Cal.App.4th 134, 154 [30 Cal.Rptr.2d 343].) But this authority is tempered by the high court's recognition that "even though a statute may appear to be unambiguous on its face, when it is considered in light of closely related statutes a legislative purpose may emerge that is inconsistent with, and controlling over, the language read without reference to the entire scheme of the law." (*Droeger* v. *Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 50 [283 Cal.Rptr. 584, 812 P.2d 931].)

But this rule of statutory construction does not mean, however, that one statutory definition may be ignored and replaced by a different one. It means only that ". . . code sections in pari materia must harmonized with each other to the extent possible . . . ." (*Pacific Southwest Realty Co.* v. *County of Los Angeles* (1991) 1 Cal.4th 155, 169 [2 Cal.Rptr.2d 536, 820 P.2d 1046].) In harmonizing the statutory scheme under the rule, the courts must avoid what defendant urges here, nullifying one statute by another. (*Oden* v. *Board of Administration* (1994) 23 Cal.App.4th 194, 202 [28 Cal.Rptr.2d 388].)

The rule of in pari materia, after all, "is a corollary of the principle that the goal of statutory interpretation is to determine legislative intent." (*Droeger* v. *Friedman, Sloan & Ross, supra,* 54 Cal.3d at p. 51.) ▮ As we shall see, there is nothing in the statutory scheme regulating conflicts of interest to suggest that the Legislature intended the definition of a "financial interest" in section 87103 of the PRA to supersede the settled definition of "financially interested" in section 1090. Although not statutorily defined, the phrase "financially interested" comes freighted with a settled judicial construction. This firmly established judicial construction has become as much a part of the statute as if it had written by the Legislature. ▮ "The construction of a statute by judicial decision becomes a part of it, . . ." (*People* v. *Hallner* (1954) 43 Cal.2d 715, 721 [277 P.2d 393]; accord, *People* v. *Kain* (1989) 212 Cal.App.3d 816, 820 [260 Cal.Rptr. 838].) ▮ As repeatedly and consistently construed, to be "financially interested" in a contract within the meaning of section 1090 does not require that the prohibited interest have a material effect on the public official's source of income. Any interest, except a remote one, which would prevent the official from exercising absolute loyalty and undivided allegiance to the best interest of the state is prohibited under the statute. (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569; § 1091.) ▮ Since the phrase "financially interested" in section 1090 does not mean the same thing as a "financial interest" in section 87103 of the PRA, it should not be rewritten under the guise of an in pari materia construction.

▮ There are other compelling reasons why claimed suppression of section 1090 by section 87103 of the PRA must be rejected. ▮ "It is well settled, also, that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505]; see also *People* v. *Moroney* (1944) 24 Cal.2d 638, 644 [150 P.2d 888].)

 Sections 1090 and 1097 are more specific than the conflict-of-interest provisions of the PRA. The former specifically apply to the making of governmental contracts while the latter apply to making, participation in making, or in any way attempting to use an official position to influence, any governmental decision. (§ 87100.) While the definition of making a contract is defined broadly under section 1090, it is not nearly as broad as the behavior at which the conflict-of-interest provisions of the PRA are aimed. (See *Commission on Cal. State Gov. Org. & Econ.* v. *Fair Political Practices Com.* (1977) 75 Cal.App.3d 716, 721-724 [142 Cal.Rptr. 468].) Since sections 1090 and 1097 are aimed at a more specific and limited form of official behavior by public officers and employees, they must be considered the more specific and thus controlling legislation in the circumstances in which they apply.

Defendant points out that a violation of the conflict-of-interest provisions of the PRA is a misdemeanor under section 91000, subdivision (a), and asserts that it is absurd that a felony violation of sections 1090 and 1097 can be committed where an official has any financial interest, however small or contingent, in a contract while a misdemeanor violation of the PRA requires a material financial interest. Such an argument ignores the breadth of section 87100 which, as we have noted, applies to a broad range of behaviors associated with any governmental decision. Since a violation of sections 1090 and 1097 can occur only with respect to the making of contracts, it is not unreasonable for the Legislature to proscribe more harshly any financial interest in the contract being made.

In any event, defendant is not in a position to contend that what he perceives as the more lenient provisions of the PRA are controlling. At the time defendant made the contracts at issue here section 87102 provided: "The requirements of Section 87100 are in addition to the requirements of Articles 2 [relating to disclosure of interests] and 3 [relating to conflict of interest codes] of this chapter and any Conflict of Interest Code adopted thereunder. However, the remedies provided in chapters 3 (commencing with Section 83100) [relating to administrative actions by the Fair Political Practices Commission] and 11 (commencing with Section 91000) [relating to criminal and civil enforcement] shall not be applicable to elected state officers for violations or threatened violations of this article."[17] (Stats. 1980, ch. 1029, § 1, p. 3299.) Accordingly, the remedial provisions of the PRA,

[17]In 1990, after defendant made the contracts at issue here, the Legislature amended section 87102 to provide that the remedies provided in chapters 3 and 11 are not applicable to elected state officers except as provided in section 87102.5. Section 87102.5 makes the remedies provided in chapter 3 applicable to members of the Legislature in certain circumstances. The Legislature also enacted section 87102.8 to make the remedies provided in chapter 3

including the criminal provisions, are not applicable to defendant and his conduct. We perceive no basis for concluding that a criminal provision that does not apply to defendant supersedes one that does. To the extent defendant's argument suggests that the PRA immunizes elected state officials from criminal prosecution for conflicts of interest, we note simply that repeals by implication are not favored (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 784 [160 Cal.Rptr. 102, 603 P.2d 19]), and we find nothing in the PRA to support such a result.

■ Moreover, the PRA specifically provides that it is not exclusive. Section 81013 provides: "Nothing in this title prevents the Legislature or any other state or local agency from imposing additional requirements on any person if the requirements do not prevent the person from complying with this title. If any act of the Legislature conflicts with the provisions of this title, this title shall prevail." By its terms, additional requirements, such as a prohibition against making a contract in which one is financially interested, would conflict with the PRA only if those requirements prevented the official from complying with the PRA. Since nothing in section 1090 would prevent or inhibit an official from complying with the PRA, it cannot be considered to be in conflict with that act.[18]

To consider the PRA as conflicting with, and thus superseding, section 1090 because it invokes a supposedly more lenient standard with respect to conflicts of interest would produce absurd consequences. It would essentially rewrite and nullify section 81013. Pursuant to that section, the Legislature cannot impose lesser standards, such as exempting or immunizing some public officials from the requirements of the PRA. (See also § 81012, subd. (b) [the PRA "may be amended or repealed by a statute that becomes effective only when approved by the electors."].) But if we concluded that the Legislature cannot impose more stringent standards, then section 81013 would effectively be construed to provide that the Legislature cannot impose any additional requirements, which is the opposite of what it says. Moreover, such a construction would essentially stand the PRA on its head by making it something in the nature of a public official's bill of rights, assuring officials that they may engage in any conduct not proscribed by the PRA. Nothing in the PRA supports such a construction.

As we have noted, the scope of section 1090 has been long established and has remained relatively static. Where the Legislature has deemed it appropriate it has altered the scope of section 1090 not by amending that section

applicable to elected state officials in certain specified circumstances. The criminal law provisions of chapter 11 are still not applicable to elected state officials such as defendant.

[18]It is noteworthy in this connection that section 87103 itself states that it defines a financial interest "within the meaning of Section 87100" and thus does not purport to provide an all-encompassing definition which would conflict with the scope of section 1090.

but by amending sections 1091 and 1091.5 to exclude certain interests from the reach of section 1090. (See also §§ 1091.1, 1091.2.) Since the PRA was adopted by initiative measure in 1974, the Legislature has amended section 1091 nine times (Stats. 1977, ch. 706, § 1, pp. 2264-2266; Stats. 1980, ch. 110, § 1, pp. 263-264; Stats. 1982, ch. 451, § 1, pp. 1821-1822; Stats. 1984, ch. 113, § 1, pp. 360-361; Stats. 1987, ch. 847, § 1, pp. 2697-2699; Stats. 1990, ch. 565, § 1, pp. 2908-2910; Stats. 1990, ch. 1593, § 1, pp. 7653-7655; Stats. 1991, ch. 341, § 1; Stats. 1991, ch. 1176, § 1), and has amended section 1091.5 four times (Stats. 1975, ch. 611, § 1, pp. 1334-1336; Stats. 1977, ch. 706, § 2, p. 2266; Stats. 1980, ch. 110, § 2, pp. 264-265; Stats. 1991, ch. 382, § 1). The Legislature has also amended section 1091.1 (Stats. 1975, ch. 24, § 6, p. 30), and enacted and then renumbered section 1091.2 (Stats. 1985, ch. 910, § 1, p. 2904; Stats. 1987, ch. 56, § 57, p. 173), which, in a more limited manner, also modifies the scope of section 1090. In a limited situation where it deemed it appropriate to do so, the Legislature incorporated section 87100, of the PRA, into an exception to the scope of section 1090. (§ 1091.2, subd. (b).)[19] These provisions, and the amendments thereto, have no meaning except in reference to section 1090 and the long-standing, judicially construed scope of that statute. This is strong evidence of a legislative understanding and intent that section 1090 continues as a viable and independent standard of conduct for governmental officials. For all of these reasons, we reject defendant's in pari materia argument.

 Defendant further complains of the court's primary instruction defining a financial interest. As we have noted, this instruction was taken from *People* v. *Darby, supra,* 114 Cal.App.2d at page 433, footnote 4, and was judicially approved in *People* v. *Vallerga, supra,* 67 Cal.App.3d at page 867 and *People* v. *Watson, supra,* 15 Cal.App.3d at pages 37 and 38. In *Darby* the trial court gave three instructions, identified as instructions A, B, and C, and the instruction given here and challenged by defendant was taken from *Darby* instruction A.[20] Defendant contends that the court should also have given *Darby* instructions B and C.

---

[19]Section 1091.2 provides: "Section 1090 shall not apply to any contract or grant made by private industry councils established pursuant to Chapter 4 (commencing with Section 15030) of Division 8 of the Unemployment Insurance Code, unless both of the following conditions are met: [¶] (a) The contract or grant directly bears on services to be provided by any member of a private industry council or any business or organization which the member represents or the contract or grant would financially benefit the member or business or organization which the member represents. [¶] (b) The affected private industry council member fails to comply with Section 87100."

[20]*Darby* instruction A, read: " 'The word "interested" as used in Government Code Section 1090 and Education Code Section 1011 means any influence which might interfere with a board member's unqualified devotion to his public duty. The interest may be direct or indirect and includes any monetary or proprietary benefits, or gain of any sort, or the contingent

The defendant in *Darby* contended on appeal that instructions B and C were inconsistent with instruction A. The Court of Appeal said that the trial court was generous in giving instructions B and C, and that even if there was a conflict there was no cause for reversal because instruction A was the correct statement of the law. (114 Cal.App.2d at pp. 435-436.) In *People* v. *Watson, supra,* 15 Cal.App.3d at page 38, the court held that it is not error for a trial court to refuse to give *Darby* instructions B and C, since those instructions set forth a more limited definition of conflict of interest than that specified in the statute while instruction A is a complete and correct statement of law. Pursuant to these authorities we reject defendant's claim that the trial court should have given *Darby* instructions B and C.

■■■ Defendant's next contention is that the trial court prejudicially erred in giving inconsistent instructions as to the mental state necessary for a violation of sections 1090 and 1097.

The trial court instructed the jury on general criminal intent. It did so by using CALJIC No. 3.30 (5th ed. 1988 bound vol.) (hereafter CALJIC No. 3.30), which reads: "In the crime[s] charged in Count[s] ____, ____, and

---

possibility of pecuniary benefits. [¶] The interest is direct when the board member, in his official capacity, does business with himself in his private capacity. [¶] The interest is indirect when the board member enters into a contract in his official capacity with a business firm, which business firm, by reason of the board member's relationship to it at the time of the contract is awarded, is in a position to render actual or potential benefit to the board member on the contract the business firm has received.' "

*Darby* instruction B provided: " 'In order to find the defendant . . . guilty of the crimes alleged in the indictment, you must find beyond a reasonable doubt and to a moral certainty that the defendant has "a pecuniary or proprietary interest" in the contracts alleged in Counts I, II and III of the indictment. [¶] It is not sufficient to find that the defendant . . . had "a mere possible, contingent interest" or "mere mental interest in the question or general subject" of such contracts. In order to find the defendant guilty under any count you must find that the interest of [defendant] in the contracts alleged was such that he stood to "gain or lose something" as a result of the contracts alleged.' "

*Darby* instruction C provided: " 'The interest in contracts which is prohibited by law to members of governing bodies of school districts is not "(1) A mere possible, contingent interest, in an interest in the question or general subject to which the matter . . . relates, but one that is visible, contingent and capable of precise proof . . . it must therefore depend upon facts capable of being precisely averred and proved . . . (2) It must be a pecuniary or proprietary interest, a relation by which . . . he will gain or lose something by the result . . . (3) It must be certain, and not merely possible . . . [¶] "Thus the mere mental interest which one has in a public question merely because he is a citizen or member of the civic body to be affected by the question is not the interest which the law has in mind." [¶] The interest prohibited by law cannot be "remote, doubtful and speculative" but must be "certain in fact." [¶] The interest prohibited by law is a "certain, definable, pecuniary or proprietary interest or relation which will be directly affected" by the action taken on the contracts in question. It is a "pecuniary or personal right or privilege directly affected by or immediately dependent upon the contracts in question. [¶] In short, the interest prohibited by law must be "a direct, pecuniary interest" and not an interest that is speculative.' " (114 Cal.App.2d at p. 433, fn. 4.)

____ of the information, [namely,] ____, ____, and ____, there must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, [he] [she] is acting with general criminal intent, even though he may not know that [his] [her] act or conduct is unlawful." The court refused to give an instruction requested by defendant based upon CALJIC No. 3.31.5 (5th ed. 1988 bound vol.) (hereafter CALJIC No. 3.31.5) which would have read: "In the crimes charged in Counts 1, 2, 3 and 4 of the indictment, there must exist a certain mental state in the mind of the perpetrator. Unless such mental state exists the crime to which it relates is not committed. [¶] In the crime of violating Government Code sections 1090 and 1097, the necessary mental state is knowingly possessing a financial interest."

Defendant claims that a necessary element of the crime of violating sections 1090 and 1097 is that the accused must know he had a financial interest in the contracts. He further contends that the instruction on general criminal intent is contradictory and irreconcilable with the instruction he must have acted "knowingly." We agree that, as properly defined, the official must know he has a financial interest in the contract. We disagree, however, with the claim that the general intent instruction is inconsistent with the requirement of knowledge or that the giving of this instruction requires reversal.

Before turning to the requisite mental state, we emphasize that the prohibited act is the making of a contract in which the official has a financial interest. As the trial court correctly defined it, an official has a financial interest in a contract when, among other things, he has "a contingent possibility of monetary or proprietary benefits" (see *People* v. *Darby*, *supra*, 114 Cal.App.2d at p. 433, fn. 4), or in the words of the special instruction, when "it is reasonably foreseeable that the contract may have a financial [e]ffect . . . on any source of income of the official." Put in ordinary, but nonetheless precise, terms, an official has a financial interest in a contract if he might profit from it.

B. *The Required Mental State*

Section 1097 provides in relevant part that "[e]very officer or person prohibited by the laws of this state from making or being interested in contracts, . . . who *willfully violates* any provisions of such laws . . . ," is guilty of a felony. (Italics added.) The basic problem is to discern the meaning of "willfully" in the phrase "willfully violates [section 1090]"

contained in section 1097. ■ In the definitional provision the Penal Code, section 7, subdivision 1 provides that, unless otherwise apparent from the context, "[t]he word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." This definition "has been applied to the word 'willfully' not only when used in the Penal Code [citations], but also when used in penal provisions of other codes as well." (*People* v. *Mancha* (1974) 39 Cal.App.3d 703, 722 [114 Cal.Rptr. 392].) Thus, "[t]he the word 'willfully' as used in criminal statutes implies a purpose or willingness to commit the act (Pen. Code, § 7, subd. 1), and . . . , it implies that the person knows what he is doing[,] intends to do what he is doing and is a free agent." (*In re Trombley* (1948) 31 Cal.2d 801, 807 [193 P.2d 734].) We noted in *In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1066 [256 Cal.Rptr. 578], that "[t]he section 7 definition is entirely dependent upon the act to which 'wilful' is appended. The required intent is an intent to do just that to which the term wilful is applied. Its significance therefore is wholly dependent upon the grammar of the specific offense in which the term is employed." ■ The term "willfully" in this case is appended not to a single, isolated act but rather to a violation of the statute. Public officials violate the statutes at issue when they are "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." (§ 1090.) Consequently, "willfully," as applied in this context, means that the official must purposefully make a contract in which he is financially interested.

We next consider whether this offense also requires that the violation must have been committed knowingly. Although the trial court instructed the jury at the request of the Attorney General that the accused must have "knowingly, . . . and willfully made or cause[d] to be made a contract in which he had a financial interest," the Attorney General now contends that knowledge is not an element of the charged crimes. It is true that sections 1090 and 1097 do not use the word "knowingly" and that a jury instruction "does not establish the elements of a crime." (*People* v. *Raley* (1992) 2 Cal.4th 870, 901 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Nevertheless, section 1097 does require that the official "willfully violate[]" the conflict-of-interest law and the term "willfully," as we have noted, imports a requirement that "the person knows what he is doing." (*In re Trombley, supra*, 31 Cal.2d at p. 807.) Consistent with that requirement, and in appropriate cases, knowledge has been held to be a concomitant of willfulness.[21] Thus, for example, in *People* v. *Simon* (1995) 9 Cal.4th 493 [37 Cal.Rptr.2d 278, 886 P.2d 1271],

---

[21]Indeed, the Model Penal Code "defines the term 'wilfully' to mean 'knowingly,' in the absence of a legislative purpose to impose further requirements." (Model Pen. Code, explan-

the high court considered the mental state necessary for a violation of Corporations Code section 25401, a part of the Corporate Securities Law of 1968. This statute generally provides that it is unlawful to offer or sell a security by means of a communication which includes an untrue statement of material fact or which omits a material fact about the security. The criminal penalty for violation of that section is found in section 25540 of that code. Under its terms, any person who "willfully violates" Corporations Code section 25401 is guilty of a felony. This penal provision does not explicitly contain a requirement that the accused have knowledge of the falsity of the statement. The *Simon* court nevertheless held that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401." (9 Cal.4th at p. 522.) The court noted that under the statutory scheme, the seller was not liable in a civil action if he exercised reasonable care and did not know of the untruth or omission. (*Id.* at p. 516.) If knowledge or criminal negligence were not an element of the offense, the court reasoned, the crime would be a strict liability offense for which "criminal penalties would be imposed for conduct less culpable than that for which recovery in a private civil action is not permitted, an unreasonable application of the statutory scheme." (*Id.* at p. 522.) Moreover, the court recognized "a 'prevailing trend "away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability." . . . .' " (*Id.* at p. 521.)

For similar reasons, we conclude that knowledge is an implied element of a "willful" violation of the conflict-of- interest statutes.[22] Under the statutory scheme under review, an officer shall not be deemed to be interested in a contract if the officer has only a remote interest in the contract "and if the

---

atory note to § 2.02, p. 24.) Thus, under this code, "[a] requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears." (Model Pen. Code, § 2.02, subd. (8), p. 22.) By the same token, when an element of the offense involves the nature of his conduct, a person acts "knowingly" if he "is aware that his conduct is of that nature . . . ." (Model Pen. Code, § 2.02, subd. (2)(b)(i), p. 21.)

[22]Indeed, if there were no such requirement of knowledge and the mere making of the contracts were sufficient without any knowledge of possessing a financial interest in those contracts, then the crime would be a strict liability offense without any mens rea or criminal intent. But "Penal Code section 20 provides, 'In every crime . . . there must exist a union, or joint operation of act and intent, or criminal negligence.' The word 'intent' in section 20 means 'wrongful intent.' [Citation.] 'So basic is this requirement [of a union of act and wrongful intent] that it is an invariable element of every crime unless excluded expressly or by necessary implication.' " (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 154 [125 Cal.Rptr. 745, 542 P.2d 1337].) Because this element is neither expressly or impliedly excluded, and because the crimes are not public welfare offenses, we conclude that criminal intent is an

fact of that interest is disclosed to the body of the board of which the officer is a member and noted in its official records" and the board approved the contract in good faith without counting the vote of the officer with a remote interest. (§ 1091, subd. (a).) This provision presupposes that the official has knowledge of his interest in the contract so that he may disclose it to the board. By the nature of things, one cannot willfully fail to disclose something of which one is ignorant. Moreover, if knowledge were not a requirement under this scheme, then the official would be liable for possessing a remote interest in the contract even though he did not realize he had such an interest. As was the case in *Simon*, such a construction would impose strict criminal liability on the less culpable official who merely possesses an unknown remote interest in the contract. In order to make sense of this statutory scheme and harmonize its parts, a requirement of knowledge must be read into this statute, as it has in other criminal offenses. (See, e.g., *People* v. *Snyder* (1982) 32 Cal.3d 590, 592 [186 Cal.Rptr. 485, 652 P.2d 42] [knowledge of weapon is an implied element of section 12021]; *People* v. *Lopez* (1986) 188 Cal.App.3d 592, 596-600 [233 Cal.Rptr. 207] [knowledge of status of peace officer is an implied element of Penal Code section 148]; *People* v. *Calban* (1976) 65 Cal.App.3d 578, 585 [135 Cal.Rptr. 441] [knowledge of falsity of affidavit is an implied element of Elections Code section 29218].)

But what must the official know? (See 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 105, pp. 124-125.) There are three possible candidates for the knowledge component of making a prohibited contract. The first is that the official must know that section 1090 prohibits becoming financially interested in the contract he is making. Under this view, there is no crime unless the official knows that he is violating section 1090. Stated another way, under this view, the official must know that the act of making a contract in which he is financially interested constitutes a crime. This seems to be the candidate which defendant advocates. We reject this view.

▇▇▇▇ "[I]t is well settled that the terms "willful" or "willfully," when applied in a penal statute, require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character." (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 396 [149 Cal.Rptr. 375, 584 P.2d 512].) To act "knowingly" means only that the actor must know of

element of the charged crimes and that "knowingly," as the trial court instructed, is an implicit element of the charged crimes.

But the Attorney General is correct that "guilty knowledge," meaning here an intent to violate the law, is not required under sections 1090 and 1097. In short, it is sufficient that the defendant made official contracts with the knowledge that he might profit from them.

the existence of the facts which constitute the offense. Thus, "[k]nowledge does not refer to the defendant's awareness that what he or she does is culpable or criminal in nature. Knowledge refers to awareness of the particular facts proscribed in criminal statutes." (*People* v. *Lopez, supra,* 188 Cal.App.3d at p. 598.) In the words of the statute, "[t]he word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission." (Pen. Code, § 7, subd. 5.) As the court correctly instructed, the defendant need not have "[k]nowledge of the unlawfulness" of his conduct." (CALJIC No. 1.21.) This instruction reflects the settled law that knowledge of the unlawfulness of an act or omission is not required unless the Legislature has specifically decreed otherwise.

We therefore reject defendant's claim that he must have known his conduct amounted to a prohibited conflict of interest. This is tantamount to arguing that defendant must have known his conduct was criminal. " ' "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law does not permit any one to gainsay. . . . The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement. If a person accused of a crime could shield himself behind the defense that he was ignorant of the law which he violated, immunity from punishment would in most cases result." ' " (*People* v. Mott (1982) 140 Cal.App.3d 394, 403 [189 Cal.Rptr. 589].)

The second candidate, at the other end of the spectrum of knowledge, is that the official need only know the provisions of the contract that he is making. If those contract provisions confer a prohibited financial interest upon the official, then the official has violated the statute. Under this view, the official would act with knowledge even if he did not realize he had a financial interest in the contract, i.e., he did not know that there was a reasonable likelihood that the contract might result in a personal financial benefit to him. Thus, for example, in this case, defendant would violate the statute even if (contrary to the undisputed facts) he did not know his wife was collecting a salary and rent from QEP. We reject this view as well. It would create a new species of a strict liability offense. In some public welfare offenses, enacted for the protection of the public health and safety, the courts have held that even where the statute requires a "willful" violation, the crime is punishable without proof of criminal intent. (See, e.g., *People* v. *Baumgart* (1990) 218 Cal.App.3d 1207, 1219 [267 Cal.Rptr. 534]; *People* v. *Gonda* (1982) 138 Cal.App.3d 774, 779 [188 Cal.Rptr. 295] [collecting cases].) "Although criminal sanctions are relied upon, the primary purpose of the statutes is regulation rather than punishment or correction. The offenses are not crimes in the orthodox sense, and wrongful intent

is not required in the interest of enforcement." (*People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850].) ■■ But the conflict-of-interest statutes at issue here are not for mere regulation and hence are not strict liability offenses. Their purpose is corrective and prophylactic and heavy penal consequences are attached to their violation. Violations of these crimes are punishable by imprisonment in the state prison and disqualify the offender forever from holding any public office in this state. As the high court observed in the context of different offenses, "[t]he severe penalties imposed by those offenses [citations] and the serious loss of reputation following conviction make it extremely unlikely that the Legislature intended to exclude as those offenses the element of wrongful intent." (*People* v. *Mayberry, supra,* 15 Cal.3d at p. 155.) The same rationale applies here.

■■■ The third candidate, and the one we adopt, is that the official must know that there is a reasonable likelihood that the contract may result in a personal financial benefit to him. In essence, this is the version given to the jury by the trial court. This does not require that the official know that his act is criminal. Knowing that one may personally benefit from a contract does not require knowledge that the law prohibits a public official from having such an interest. In our view, this construction imposes a sensible scienter requirement; it restricts the reach of this felony statute to circumstances one might plausibly call wrongful intent or malum in se, a favored result. (See *People* v. *Simon, supra,* 9 Cal.4th at pp. 518-519.) In our society, people of ordinary sensibility should recognize, without the intervention of a criminal proscription, that a public official is a trustee and that it is wrong for such a trustee to engage in self-dealing, including the contingent feathering of one's own nest.

There is nothing in this construction which is inconsistent with the instruction on general criminal intent given by the trial court. (CALJIC No. 3.30.) As we have explained at length, neither the requirement of willfulness nor that of knowledge requires any intent to violate the law or that the defendant know his conduct is unlawful. This instruction informs the jury that "[w]hen a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." What the law declares to be a crime in this context is the making of a contract with the knowledge that the official in question may profit from it. The jury was expressly so instructed on this required mental state. Since the jury was instructed correctly on the mental elements of the offense, the claim that the general intent instruction in CALJIC No. 3.30 somehow deflected the jury from applying the proper elements of the crime rings hollow. (See *People* v. *Fabris* (1995) 31 Cal.App.4th 685, 698-699 [37 Cal.Rptr.2d 667].)

Defendant claimed that he did not perceive that the contracts would have any effect on his income because he believed that the funds his wife received came from donors and were not dependent upon the contracts with QEP. Nothing in the instruction on general criminal intent prevented defendant from arguing this theory to the jury. Indeed, defense counsel made that precise argument. The instructions given were sufficient to allow the jury to pass on this defense and the jurors simply rejected it.

██ On the other hand, the trial court should not have rejected defendant's instruction based upon CALJIC No. 3.31.5. This instruction would have informed the jury that "the necessary mental state is knowingly possessing a financial interest." But the error could not have affected the jury's verdict. As this rejected instruction itself would have informed the jury, "[t]he mental state required is included in the definition of the crime set forth elsewhere in these instructions." Those definitional instructions expressly advised the jury that defendant must not only willfully make a contract in which he had a financial interest, but that he also had to do so "knowingly." Although the rejected instruction correctly stated the law, in viewing the instructions as a whole we find that the court fully and fairly instructed the jury on all of the elements of the charged offenses, including the requirement that defendant must have known he had a financial interest in the contracts, and did not give a contradictory instruction on the required mental elements. Consequently, the error was harmless. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 571-572 [280 Cal.Rptr. 631, 809 P.2d 290].)

██ Defendant next contends that under the instructions given by the trial court, sections 1090 and 1097 are unconstitutionally vague and indefinite. Once again we disagree. Due process requires that a statute be sufficiently definite to provide a standard of conduct for those whose activities are proscribed and a standard by which the law may be enforced and guilt ascertained. (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732]; accord, *People* v. *Kelly* (1992) 1 Cal.4th 495, 533 [3 Cal.Rptr.2d 677, 822 P.2d 385].) This requires that a violation be described with reasonable certainty so that ordinary people can understand what is proscribed and so that the innocent are not trapped without fair warning. (35 Cal.3d at pp. 268-269.) Stated another way, a criminal statute "must be definite enough to provide a standard of conduct for those whose activities are proscribed" and it must "provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement." (*People* v. *Heitzman* (1994) 9 Cal.4th 189, 199 [37 Cal.Rptr.2d 236, 886 P.2d 1229].) In determining whether the challenged statute meets the constitutional requirement of fair notice, " 'we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing

the statutory language.'" (*Id.* at p. 200, quoting *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].) In *People* v. *Watson, supra,* 15 Cal.App.3d at pages 33 and 34, and in *People* v. *Darby, supra,* 114 Cal.App.2d at pages 427 and 428, the courts held that sections 1090 and 1097, as applied by the trial court here, meet this test and are not void for vagueness. Moreover, by construing the statutory language in question these judicial decisions provided additional fair notice of its meaning. We therefore reject defendant's due process contention.[23]

■ Defendant's penultimate jury-instruction contention is that the failure to give CALJIC No. 2.02 exacerbated the other asserted errors of which he complains. CALJIC No. 2.02 advises the jury with respect to the sufficiency of circumstantial evidence to prove a specific intent or mental state. With respect to circumstantial evidence the court instructed the jury in accordance with CALJIC Nos. 2.00 (5th ed. 1988 bound vol.) (hereafter CALJIC No. 2.00) and 2.01 but refused a requested instruction based upon CALJIC No. 2.02.[24]

---

[23]Defendant asserts that sections 1090 and 1097 must be considered void if they may be violated by "the mere possibility of an indirect, attenuated effect on the finances of an enterprise employing a public official's spouse and therefore on the official's income." We have already rejected that contention. But in fact, there was nothing indirect or attenuated at all about the contracts' financial effect on QEP. Defendant directed that public moneys be used to pay the employees of QEP, thus saving QEP the expense of paying its own employees, and thus having a direct and immediate effect on QEP's finances. This case involves an indirect financial interest of defendant only because, as in most cases of this sort, it cannot be shown that Nancy's salary and benefits and the Honigs' rental receipts were directly dependent upon the contracts in issue, although they were continuous and escalating during the periods in which the contracts were operative. In this connection we note that sections 87100 and 87103, which defendant regards as more lenient than sections 1090 and 1097, would not even require a showing of the potential for personal benefit; rather, it is sufficient that one of the identified entities or interests be affected, including "[a]ny source of income," aggregating $250 or more. (§ 87103, subd. (c).) Since QEP was a source of income to defendant, the contracts benefiting QEP were in themselves sufficient to violate sections 87100 and 87103 without any further showing. The instructions given by the trial court in this prosecution under sections 1090 and 1097 required more, although they did not go so far as to require proof of direct and certain benefits flowing to defendant from the contracts.

[24]The court instructed in accordance with CALJIC No. 2.00 as follows: "Evidence consists of testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or nonexistence of a fact. [¶] Evidence is either direct or circumstantial. [¶] Direct evidence is evidence that directly proves a fact, without the necessity of an inference. It is evidence which by itself, if found to be true, establishes that fact. [¶] Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn. [¶] An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. [¶] It is not necessary that facts be proved by direct evidence. They may be proved, also, by circumstantial evidence or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other."

█ CALJIC No. 2.02 was designed to be used in place of CALJIC No. 2.01 when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence. (See Use Note to CALJIC No. 2.02.) It should not be given where the evidence is either direct or, if circumstantial, is not equally consistent with a conclusion of innocence. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 167 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Wiley* (1976) 18 Cal.3d 162, 174-176 [133 Cal.Rptr. 135, 554 P.2d 881].) Furthermore, it should not be given simply because the incriminating evidence is indirect, but is appropriate only when proof of guilt depends upon a pattern of incriminating circumstances. (*People* v. *Heishman, supra,* 45 Cal.3d at p. 167; *People* v. *Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].)

█ Although defendant claimed he did not know his conduct was criminal, his knowledge of all of the facts giving rise to a prohibited financial interest in the contracts was overwhelmingly established and for the most part was conceded in his own testimony. Thus, those facts did not rest substantially upon circumstantial evidence. The court did not err in instructing the jury in accordance with CALJIC No. 2.01 rather than No. 2.02.

Defendant's last contention of instructional error relates to CALJIC No. 2.90, the reasonable doubt instruction given by the trial court. (See Pen.

---

The court instructed the jury in accordance with CALJIC No. 2.01 as follows: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (one) consistent with the theory that the defendant is guilty of the crime, but, (two) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt."

The court rejected an instruction based upon CALJIC No. 2.02 which would have instructed: "The mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offense charged in Counts 1, 2, 3, and 4 unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required mental state but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to such mental state is susceptible of two reasonable interpretations, one of which points to the existence of the mental state and the other to the absence of the mental state, you must adopt that interpretation which points to the absence of the mental state. If, on the other hand, one interpretation of the evidence as to such mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Code, §§ 1096, 1096a.) He claims it inaccurately defines the constitutional requirement of proof beyond a reasonable doubt. The argument is premised on the grant of certiorari by the United States Supreme Court in *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862], certiorari granted September 18, 1993, affirmed *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239]. On March 22, 1994, the United States Supreme Court held in *Sandoval* that CALJIC No. 2.90, taken as a whole, correctly conveyed the concept of reasonable doubt and consequently there was no reasonable likelihood that the jurors understood the instruction to allow a conviction on proof insufficient to meet the standards set forth *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]. (*Victor* v. *Nebraska, supra,* 511 U.S. 1.) In the words of the court, ". . . in the context of the instructions as a whole we cannot say that the use of the phrase ['moral certainty'] rendered the instructions given in Sandoval's case unconstitutional." (*Id.* at p. ___ [127 L.Ed.2d at p. 597].) Accordingly, we reject defendant's final instructional argument.

## II. *Evidentiary Rulings*

 Prior to trial the court granted a prosecution motion *in limine* to exclude certain evidence. The court ruled that defendant would not be permitted to introduce evidence that QEP expended substantial amounts of money in the districts in which it operated, evidence of the utility of the QEP program within school districts, or evidence of QEP's private business donors. The court subsequently modified its ruling to permit the defense to introduce evidence that it obtained its primary funding from private donors, had sufficient resources to conduct its operations without assistance from the DOE, did not charge districts for its program, and in fact spent funds in the districts in which it operated. Defendant contends that the court committed reversible error in granting the prosecution's motion *in limine*. The contention is unpersuasive.

 "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) It has been said that a trial court is vested with wide discretion in determining the relevance of proffered evidence. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) However, it has also been said that in determining the admissibility of evidence proffered by a defendant in a criminal case, a trial court should give the defendant the benefit of any reasonable doubt. (*People* v. *Wright* (1985) 39 Cal.3d 576, 584 [217 Cal.Rptr. 212, 703 P.2d 1106].)

But this does not mean that a trial court is required to allow the defendant to define the issues or to introduce evidence without regard to its relevance to the issues defined by law. A trial court has no discretion to admit irrelevant evidence. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 323 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Kitt* (1978) 83 Cal.App.3d 834, 849 [148 Cal.Rptr. 447]; *People* v. *Slone* (1978) 76 Cal.App.3d 611, 631 [143 Cal.Rptr. 61].)

 As we have previously explained, sections 1090 and 1097 are concerned with what might have happened rather than merely what actually happened and their objective is to remove or limit the possibility of any personal gain which might bear on an official's decision. (*Stigall* v. *City of Taft*, *supra*, 58 Cal.2d at pp. 569-570.) They are aimed at eliminating temptation, avoiding the appearance of impropriety, and assuring the government of the officer's undivided and uncompromised allegiance. (*Thomson* v. *Call*, *supra*, 38 Cal.3d at p. 648.) Accordingly, they establish a standard of official conduct which does not depend upon such things as fraud, dishonesty, unfairness or loss to the state, and which may be violated regardless how fair or beneficial the government contract may be. (*People* v. *Darby*, *supra*, 114 Cal.App.2d at pp. 426-427, 437.) Such matters are not relevant in a prosecution under sections 1090 and 1097. (*People* v. *Vallerga*, *supra*, 67 Cal.App.3d at p. 865; *People* v. *Watson*, *supra*, 15 Cal.App.3d at p. 39; *People* v. *Darby*, *supra*, 114 Cal.App.2d at pp. 426, 437; see also *Thomson* v. *Call*, *supra*, 38 Cal.3d at p. 649.) In view of these authorities the trial court did not err in refusing to permit defendant to present evidence of the value of the QEP program in the districts in which it operated, or that he had a good motive in making the contracts in issue.

 Defendant asserts that he planned to introduce evidence from some of QEP's private contributors to establish that its funding was not dependent upon having a developed program and that the private contributors would have funded QEP while it developed its program. According to defendant this would have established that there was no linkage between QEP's success (and thus Nancy's salary and benefits and the Honigs' rent receipts), and the development of the QEP program by workers funded by the DOE.

There are two flaws in this argument. First, defendant made the contracts that financially benefited QEP at a time when he had a substantial financial interest in QEP through Nancy's salary and benefits and their joint rental receipts. Whether QEP would have received sufficient private donations to develop and implement its programs or to make the same salary and benefit payments to Nancy and rental payments to the Honigs without the benefit of the DOE contracts, are matters that will of necessity remain speculative since the actual events did not take that course. And, whether in making the

contracts defendant was actually influenced by his financial interest in QEP is a matter that by its nature is not subject to direct proof and can be determined only through inference. In these respects this case is typical of many, if not most, conflict-of-interest situations. That is precisely why our conflict-of-interest statutes are aimed at the *possibility* of any personal influence and are not solely concerned with its actuality. (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at pp. 569-570; *People* v. *Vallerga, supra,* 67 Cal.App.3d at p. 865; *People* v. *Watson, supra,* 15 Cal.App.3d at p. 39.) In short, in a prosecution under sections 1090 and 1097 it is not necessary to establish a direct dependency between financial benefits to an official and a contract made by him. (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at pp. 569-570.) It is sufficient under the statute that defendant knew he had an indirect financial interest in QEP through Nancy's salary and benefits and the Honigs' joint rental receipts and nevertheless made a contract in his official capacity that benefited QEP. Whether QEP could have or would have paid the same salary, benefits, and rent without the DOE contracts is both speculative and irrelevant.

Second, this theory of admissibility was not presented to the trial court. The prosecution's pretrial motion sought to exclude evidence of the amount of funds QEP raised from private and corporate donors, the amount of money it expended in implementing its programs, and the quality of the services it rendered. The defense reply urged the court to permit it to introduce evidence of QEP's financing mechanisms, namely, that it raised funds through private donations and expended those funds implementing its programs, and to permit it to show that its programs were valuable. As we have noted, the court initially granted the prosecution's motion but subsequently modified its order to permit the defense to introduce its financial evidence. Defendant concedes the original adverse ruling was changed but submits the modification allowed him only to adduce evidence of the amounts of funds that QEP expended in connection with the contracts in issue. Contrary to this submission, the modification vitiates defendant's claim that the order granting the motion *in limine* barred him from presenting his defense of lack of knowledge of any financial interest. The modification occurred when the prosecution objected to the use of a diagram by defense counsel in his opening statement. The trial court ruled in favor of defendant and explained its ruling as follows:

"The defendant has presented a diagram which disputes the prosecution's theory of money ultimately flowing from the Department of Education to his wife. He maintains that QEP financed the program in the school districts in question except for the employment of the four employees. He also maintains that QEP spent money in excess of that paid by the Department of Education for the employment of the four employees.

"In other words, the defendant is attempting to show that there was no flow of money from the Department of Education to QEP; the defendant's wife was independently paid for her salary and rental and would not [*sic*] have received these payments even if the defendant had not approved the contracts; he therefore had no financial interest in the contracts; the Department of Education only paid for employees to administer QEP programs in districts that decided that they wanted to utilize them.

"At this time, the court rules that the defendant may utilize its chart presenting this theory of the case during opening argument.

"The Attorney General asserts that money flowed from the Department of Education through the school district in question and their employees to the defendant's wife. The defendant is entitled to present an argument to the contrary to the jury.

"At this time, the court notes that the Attorney General has not presented legal authority which states that the defendant possessed a financial interest, even if QEP possessed the ability to independently pay his wife. Absent such authority, the Court must permit the defendant to contest the prosecution's straightforward cash flow theory of the case."

This ruling was a green light for the defendant to pursue his state-of-mind defense. He was permitted to testify that he did not think there was any possibility that a financial benefit to QEP or himself would accrue when he authorized the contracts. Indeed, both sides introduced evidence of QEP's financial arrangements and standing. But the defense did not seek to call its private donors to testify and did not otherwise inquire whether such evidence would be within the court's ruling.[25] A judgment may not be reversed due to the exclusion of evidence unless the substance, purpose, and relevance of the evidence were made known to the trial court. (Evid. Code, § 354, subd. (a).)

---

[25]The defense was permitted to present the expert testimony of a certified public accountant to the effect that during the period in question QEP had sufficient financial reserves to have paid the Honigs' pecuniary benefits several times over, and that in the absence of the DOE contracts it would have had even greater capacity to make those payments, although the witness's reasoning on the latter point was tenuous at best. The prosecutor objected to the latter point on the ground that the accountant could not take into account the qualitative effect of the DOE-funded workers' contributions to the development of the QEP program but the court would not permit the prosecutor to go into questions concerning the value of QEP's services and overruled the objection. After the close of evidence the defense sought, successfully in part, to limit the prosecution's argument and at that time said that it could have called corporate donors to testify that they were prepared to continuously fund QEP. However, the defense had not attempted to introduce such evidence and in view of the fact that the court permitted it to introduce its financial evidence it is not apparent that the court would have excluded this evidence so long as it did not involve opinions as to the value of QEP's services.

This particular evidence, and its asserted relevance, was not presented to the trial court and thus cannot serve as a ground for reversal on appeal.

 Defendant asserts that he was precluded from presenting evidence from school superintendents and principals that would have shown that QEP's program was "fully developed and highly successful long before the state contracts and the consultants' work under them." Defendant did not offer such evidence at trial and the record refutes the possibility that he could have done so. Defendant made the contracts which are at issue in early 1986, early 1987, and early 1988. The cumulative term of the contracts ran from July 1, 1986, through June 30, 1989. The testimony of the QEP employees who testified, including Page, Dunbar, Law, Perondi, Rodriguez, and Tramutola, and the documentary evidence submitted, clearly establish that QEP and its program were undergoing growth and development during that period. Defendant did not suggest otherwise and his testimony shows that he was aware that QEP was undergoing growth and development during the period of the state contracts. The official reports QEP was required to file with the Attorney General confirm this evidence. For example, in the year immediately preceding the first challenged contract QEP had relatively modest revenue of $221,330 and expenditures of $123,528, while in the last year of the period covered by the contracts QEP had grown more than fourfold, with revenues of $1,011,074 and expenses of $1,209,454. It roughly doubled again in the next year. In the record reference cited by defendant on appeal, defendant's trial counsel referred to evidence that the QEP reference manual was not finalized in 1989 and said that he could produce evidence that the QEP program was developed and successful before completion of the manual. But a showing that QEP's program was developed and successful before completion of the manual in 1989 is not evidence that QEP's program was fully developed and highly successful long before 1986 when the first of the challenged contracts was made. In its opposition to the prosecution's *in limine* motion the defense made it clear that it wished to present evidence that the QEP program was valuable and that the state received benefits from the challenged contracts. It pointed to proposed testimony from school administrators whose districts received services during the period covered by these contracts. The defense neither made an offer of proof of specific evidence that the QEP program was fully developed and successful before the challenged contracts, nor suggested that it would seek to rebut the evidence that the QEP program grew and developed during the period covered by these contracts. The trial court correctly ruled that whether the state and school districts benefited from the QEP programs and the challenged contracts was irrelevant and no other viable theory for admission of this evidence was placed before the court.

 Defendant contends that the court erred in excluding evidence that the chief counsel of the DOE had offered an opinion that the contracts were

not improper. The court excluded the evidence after conducting a hearing outside of the jury's presence to consider its admissibility. (Evid. Code, § 402.) The facts relevant to this proffered evidence are as follows:

Defendant's deputy, James Smith, who was the agent directed to set up the contracts, vigorously opposed the making of the contracts each time the question arose. Smith, who was not aware that the Honigs received pecuniary benefits from QEP, testified that he was concerned that the contracts seemed improper, or at least that they would be perceived as improper, although he also claimed that his concerns were political rather than legal. At some time in 1985, Smith talked to Joseph Symkowick, chief counsel for the DOE, and asked for an oral opinion on the propriety of the QEP/DOE situation as he knew it. He did not know, and thus did not tell Symkowick, that defendant and Nancy had a financial interest in QEP. Smith testified that Symkowick told him the arrangement did not appear to be illegal and that he passed that information along to defendant.

Symkowick remembered the conversation and also placed it in 1985. He said that Smith expressed concern about the propriety of the arrangement and asked for his opinion. Smith told him that the DOE was giving federal categorical aid moneys to school districts in the East Bay area and that Nancy was working in those districts. Smith did not provide any further information about Nancy's role. He did not tell Symkowick about QEP and Symkowick did not know about QEP. Smith did not tell Symkowick that the funds would be used to pay personnel to work for a private company with which Nancy was affiliated. And he did not tell Symkowick that Nancy was receiving a salary and rental payments from a private company for whom the employees would work. Symkowick asked Smith whether Nancy was receiving any money from the DOE and was told that she was not. He asked whether she was receiving any money from the districts that were getting the federal funds and was told that she was not. He asked whether she was getting any money, either directly or indirectly that Smith knew of, and was told that she was not. Symkowick testified that he told Smith that he could understand that the issue might be sensitive, "but if there is no money or dollars or anything else that either went to—goes to her either directly or indirectly," then he could not see anything wrong with it, legally.

The trial court clearly did not err in excluding this evidence. First, Symkowick knew virtually nothing of the true circumstances surrounding the contracts and the opinion he offered was not based upon the facts as they existed. Second, Symkowick's opinion was contingent, that is, he saw no problem if Nancy was not receiving benefits directly or indirectly. Finally, "[t]he defense of action taken in good faith, in reliance upon the advice of a

reputable attorney that it was lawful, has long been rejected. The theory is that this would place the advice of counsel above the law, and would also place a premium on counsel's ignorance or indifference to the law." (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 220, p. 254, citing *People* v. *Vineberg* (1981) 125 Cal.App.3d 127, 137 [177 Cal.Rptr. 819]; *People* v. *Aresen* (1949) 91 Cal.App.2d 26, 35 [204 P.2d 389]; *People* v. *McCalla* (1923) 63 Cal.App. 783, 795 [220 P. 436].) Since Symkowick offered an oral opinion which was based upon less than all of the relevant facts, did not purport to provide any factual information, and defendant was in full possession of all of the relevant facts, the trial court did not err in excluding evidence of Symkowick's opinion. (See *People* v. *Flumerfelt* (1939) 35 Cal.App.2d 495, 497-498 [96 P.2d 190]; *People* v. *McCalla*, *supra*, 63 Cal.App. at p. 793.)[26]

 Defendant contends that the trial court erred in excluding character evidence. At trial defendant called Dr. Diane Ravitch, a former assistant secretary of education in the United States Department of Education, who offered a broad assessment of defendant's character, both in terms of her opinion and of defendant's reputation. When the witness was asked whether defendant's character was such that he would engage in the conduct alleged in the indictment, the prosecutor objected on the ground that the witness had said that she had no knowledge of the facts surrounding the case. The court excluded the evidence under Evidence Code section 352, on the grounds that its probative value was outweighed by the prejudicial effect, it would result in an undue consumption of time, and it would tend to confuse and mislead the jury. Similarly, Dr. Gail Anderson, a school superintendent from Piedmont, was permitted to offer a broad assessment of defendant's character but was not allowed to state whether his character was such that he would engage in the crimes of which he was accused.

 Under the statute, a defendant in a criminal action may introduce evidence of his character or a trait of his character in the form of an opinion or evidence of reputation, but not in the form of specific conduct, in order to prove conduct in conformity with such character or trait of character. (Evid.

---

[26]While mistake of law would be no defense here, mistake of fact, if supported by substantial evidence, could be. The decisions in *Flumerfelt* and *McCalla* illustrate the distinction. In both cases the defendants were charged with knowingly selling securities without a permit. In *McCalla* evidence that counsel had opined that the subject of sale was not a security for which a permit was needed was properly excluded because mistake of law is not a defense. (63 Cal.App. at p. 793.) In *Flumerfelt* it was held that the defendant could properly introduce evidence that counsel had advised that a permit had been obtained because a mistake of fact would rebut the knowledge element of the offense. (35 Cal.App.2d at pp. 497-498.) Here Symkowick provided no factual information to defendant and his opinion was properly excluded.

Code, § 1102, subd. (a).) However, character evidence must relate to the particular character trait involved in the charged offense. (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) § 33.4, p. 1187.) The witness must be sufficiently acquainted with that trait of the defendant's character to offer an opinion. (*People* v. *Harris* (1969) 270 Cal.App.2d 863, 872 [76 Cal.Rptr. 130].) The witness's testimony must be based upon personal knowledge of the subject matter, and testimony in the form of an opinion must be rationally based upon the perception of the witness and helpful to a clear understanding of his or her testimony. (Evid. Code, §§ 702, 800.) A broad, general opinion with respect to an ultimate fact is objectionable if the question can be broken down and simplified to provide greater assistance to the trier of fact. (*People* v. *Brown* (1981) 116 Cal.App.3d 820, 828 [172 Cal.Rptr. 221]; *People* v. *Arguello* (1966) 244 Cal.App.2d 413, 418 [53 Cal.Rptr. 245].)

■■■■■■ Under the circumstances the trial court did not err in sustaining objections to the questions at issue. The witnesses professed total ignorance of the facts surrounding the charged offenses and defendant made no effort to show they understood the legal nature of the charges or the traits of character that might be relevant. Without a proper foundation the questions were overbroad and vague, and amounted to nothing more than asking whether the witnesses believed defendant should be convicted. The questions could have been broken down into more specific inquiries and in fact the witnesses were permitted to testify fully with respect to specific traits of character. Had the questions been permitted in the form asked it would have been necessary for the prosecutor, on cross-examination, to delve at length into the witnesses' understanding of the nature of the charged offenses and the character traits involved. Under these circumstances the court did not err in concluding that the proffered evidence had marginal, if any, probative value, could be prejudicial to the prosecution, would have a tendency to confuse the jury, and would have required an undue consumption of time.

### III. *The Nature of the Contracts*

■■■■■■ By their terms, sections 1090 and 1097 are directed at the making of official "contracts." Defendant contends that the transactions at issue were actually grants rather than contracts and thus beyond the scope of sections 1090 and 1097.

We are not convinced that calling the QEP transactions "grants" rather than "contracts" would have any effect on the applicability of sections 1090 and 1097. Defendant points out that in enacting the Civil Code in 1872, the Legislature defined a contract and provided for its essential elements in Civil

Code sections 1549 and 1550. At the same time the Legislature defined "grant" in Civil Code section 1053 as a transfer in writing. Defendant asserts that these terms must be mutually exclusive and that "contract" must not include "grant." However, contemporaneously with the adoption of Civil Code sections 1053, 1549 and 1550, the Legislature enacted Civil Code section 1040 to provide: "A voluntary transfer is an executed contract, subject to all rules of law concerning contracts in general; except that a consideration is not necessary to its validity." Pursuant to Civil Code section 1040 the Legislature included "grants" within the broader subject of "contracts" and subjected them to the same rules of law. Accordingly, where a state official makes a contract in which he has a financial interest we see no basis upon which he can escape responsibility under sections 1090 and 1097 by claiming that the transfer was actually a "grant."

In any event, assuming for the sake of argument that the distinction between grants and contracts has relevance, we do not find defendant's argument persuasive. In considering defendant's contention we must be guided by two well-established principles. First, the court instructed the jury that in order to find defendant guilty of the charged offenses it would be required that it find that he made a contract in which he had a financial interest, and a brief definition of "contract" was provided. The jury found that by entering into the transactions at issue defendant made contracts in which he had a financial interest. ▮ In reviewing these findings on appeal we must apply the substantial evidence rule. Accordingly, we will review the record in a light most favorable to the judgment, resolving all conflicts in the evidence and drawing all reasonable inferences in support of the jury's determination. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Second, as we have already noted, sections 1090 and 1097 are concerned with the conduct of governmental officials rather than technical rules governing the making of contracts. Accordingly, in considering the legal standard against which the evidence must be measured we may not give those provisions a narrow and technical interpretation that would limit their scope and defeat the legislative purpose. (*Stigall* v. *City of Taft*, *supra*, 58 Cal.2d at pp. 569, 571; *Millbrae Assn. for Residential Survival* v. *City of Millbrae*, *supra*, 262 Cal.App.2d at p. 237.) While we will not expand the scope of sections 1090 and 1097 beyond their reasonable meaning, neither will we read those sections in an unduly narrow and technical sense.

▮ We find ample evidence to support the finding that the transactions in issue were in fact contracts. First, the executed written documents purport to be contracts, that is, they were set up in the form of contracts, state that they are contracts, and were written on standard state forms for

making contracts. Grants and contracts are essentially subject to the same rules of interpretation. (Civ. Code, § 1066.) These rules provide that the interpretation of written instruments is to be governed by their language; the words of the instruments are to be understood in their ordinary and popular sense; and, to the extent technical words are used, they are to be interpreted as understood by persons in the profession or business to which they relate. (Civ. Code, §§ 1638, 1644, 1645; Code Civ. Proc., §§ 1861, 1865.) The language used in the written instruments, both in their ordinary and popular sense and in their technical sense, are consistent with construction of the transactions as contracts and inconsistent with construction of the transactions as grants.

 Second, although in some instances a written instrument may be construed to be something other than what it purports to be, such an interpretation is not favored and will not be adopted in the absence of convincing evidence to that effect. (*Beeler* v. *American Trust Co.* (1944) 24 Cal.2d 1, 7 [147 P.2d 583]; *Workmon Constr. Co.* v. *Weirick* (1963) 223 Cal.App.2d 487, 491 [36 Cal.Rptr. 17].) At trial a number of witnesses testified to usual procedures that accompany an award of grant money, such as notification to school districts and potential service providers who may compete to receive funds or provide services anticipated by the grant program. None of these procedures was followed here; rather, defendant simply directed his staff to make arrangements for the DOE to provide funds for the payment of QEP's employees through their districts while they were on leaves of absence in order to work for QEP. To construe these transactions as grants would be to disregard the procedures employed to accomplish the transactions as well as the form of the instruments utilized.

Third, general rules of interpretation require us to consider the circumstances surrounding the making of the contracts, the matters to which they relate, and the situation of the parties to the contracts. (Civ. Code, § 1647; Code Civ. Proc., § 1860.) And specific rules applicable to sections 1090 and 1097 require that we view the transactions in a broad manner and avoid narrow and technical definitions of "contract." (*Stigall* v. *City of Taft, supra,* 58 Cal.2d at pp. 569, 571.) We may not restrict our consideration to the parties named in the written instruments but must consider as a whole all of the dealings of the various involved parties. (*Thomson* v. *Call, supra,* 38 Cal.3d at pp. 644-645.) In the transactions at issue here each of the compensated employees agreed to work for QEP and to this end took leaves of absence from their school districts. During the periods covered by the contracts the employees worked under the exclusive direction and control of QEP, performing QEP's business, and without the supervision or direction of their districts, the districts in which they worked, or the DOE. The DOE agreed to pay funds to the employees' districts and the districts agreed to act

as conduits for the payment of those funds to the QEP employees. In substance these transactions were simply multiparty contractual agreements for the payment of QEP employees by the DOE. (See *Thomson* v. *Call, supra,* 38 Cal.3d at pp. 644-645.)

■ Finally, defendant has pointed to no legal authority which would permit him to make a unilateral decision to bestow grant money in this fashion. Article XVI, section 3, of our state Constitution provides in relevant part: "No money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a State institution, nor shall any grant or donation of property ever be made thereto by the State, . . ." Article XVI, section 6, of our state Constitution provides in relevant part: "The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever . . . ." These provisions are broad limitations and were not intended to unduly restrict the state in the expenditure of public funds for legitimate state purposes. Thus the state may pay its legal liabilities, make contracts supported by consideration, and spend money for duly determined public purposes. The determination whether an expenditure serves a public purpose is for the Legislature to make through duly enacted legislation. (*Patrick* v. *Riley* (1930) 209 Cal. 350, 356-357 [287 P. 455]; *Wessling* v. *Nye* (1909) 156 Cal. 472, 474-475 [105 P. 408].) But in the absence of such a legislative determination, public officials have no authority to spend public funds. (*Ibid.*) Thus it has been said: "Where the appropriation is aimed chiefly at benefiting an individual or group of individuals other than the public in general, it seems that there should be some contractual relation imposing a legal liability on the state, some specific authority justifying the expenditure, or some enforceable claim." (58 Cal.Jur.3d, State of California, § 88, pp. 244-245.)

■ We have not found, nor has defendant identified, any statutory program of the Legislature pursuant to which these expenditures could qualify as "grants." Within limits the Legislature may delegate authority to administrative officials to set up programs for the expenditure of public funds. The Legislature, however, has delegated questions of policy within the DOE to the State Board of Education rather than to the Superintendent of Public Instruction. (Ed. Code, § 33030 et seq.) We have not found, and defendant has not identified, any state educational regulatory program pursuant to which these expenditures might qualify as "grants." We find nothing in the authority of the Superintendent of Public Instruction which would give him the discretionary authority to make expenditures as "grants" in the

absence of a duly established statutory or regulatory program. (Ed. Code, § 33111 et seq.)

There was evidence to indicate that in fact federal grant funds were used to fund the QEP contracts. However, that factor does not alter our conclusion. It is in general the policy of our Legislature to accept federal funds to be expended pursuant to the requirements of federal programs under the auspices of the State Board of Education and pursuant to rules and regulations established by that board. (Ed. Code, § 12000 et seq.) The Superintendent of Public Instruction has the authority to prescribe rules and regulations under which contracts, agreements or arrangements may be made with agencies of the federal government for funds, services, commodities or equipment to be made available to public schools and all contracts, agreements and arrangements must be made according to those regulations and in no other manner. (Ed. Code, §§ 33113-33114.) There is no evidence in the record to suggest that the funds utilized in the QEP contracts were expended pursuant to the regulations of the State Board of Education or that the contracts were made according to regulations established by the superintendent. We find no provision of law which would vest the superintendent with the unilateral power to direct the expenditure of federal funds in the manner in which he acted.

In the absence of factual evidence and legal authority which would support construction of the QEP contracts as "grants," we will not so construe those transactions simply to enable defendant to avoid the legal consequences dictated by sections 1090 and 1097. In order to do so we would be required to ignore the form the contracts took, the procedures by which they were made, and their substance, in order to construe them to be something for which we find no legal authority in the first place. Sections 1090 and 1097 are not to be applied in a narrow and technical manner that would limit their scope and defeat their legislative purpose. (*Stigall* v. *City of Taft*, *supra*, 58 Cal.2d at pp. 569, 571.) Accordingly, we reject defendant's contention.

### IV. *Prosecution by the Attorney General*

The Attorney General acted as the prosecutor in this case. Prior to trial defendant unsuccessfully moved to dismiss the indictment on the ground that the Attorney General lacked authority to prosecute the action. He now contends that the judgment must be reversed for that reason. We disagree.

Penal Code section 923 provides: "Whenever the Attorney General considers the public interest requires, he may, with or without the concurrence

of the district attorney, direct the grand jury to convene for the investigation and consideration of such matters of a criminal nature as he desires to submit to it. He may take full charge of the presentation of such matters to the grand jury, issue subpoenas, prepare indictments, and do all other things incident thereto to the same extent as the district attorney may do." Section 12550 of the Government Code provides: "The Attorney General has direct supervision over the district attorneys of the several counties of the State and may require of them written reports as to the condition of public business entrusted to their charge. [¶] When he deems it advisable or necessary in the public interest, or when directed to do so by the Governor, he shall assist any district attorney in the discharge of his duties, and may, where he deems it necessary, take full charge of any investigation or prosecution of violations of law of which the superior court has jurisdiction. In this respect he has all the powers of a district attorney, including the power to issue or cause to be issued subpoenas or other process."

Defendant recognizes that section 12550 and Penal Code section 923 would give the Attorney General apparent authority to undertake prosecution of this action, but he asserts that those provisions are unconstitutionally broad in view of article V, section 13, of our state Constitution, which provides in relevant part: "Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney." Defendant argues that this constitutional provision restricts the Attorney General's authority to prosecute criminal actions to cases where he determines that the law is not being adequately enforced and does not give him the same broad authority to act as prosecutor when he deems it advisable or appropriate as do the statutory provisions.

In this case it is unnecessary to consider any potential conflict in the scope of statutory and constitutional provisions, since the constitutional provision is sufficient authority for resolution of defendant's contention. The constitutional provision unquestionably gives the Attorney General the authority to prosecute criminal actions. The only limitations are that the action be within the superior court's jurisdiction, and that the Attorney General be of the opinion that any law of the state is not being adequately enforced in any county. That provision was intended to ensure that the laws of the state are enforced rather than to insulate criminal defendants from enforcement of the laws. It does not suggest that a showing of necessity for prosecution by the Attorney General is in some manner jurisdictional. Instead, it confers broad discretion upon the Attorney General to determine when to step in and

prosecute a criminal case. ▇▇▇ And that provision does not suggest that the Attorney General's discretion is reviewable by the superior court at the behest of a defendant.

But assuming, without deciding, that a criminal defendant may object to prosecution by the Attorney General, it cannot be doubted that the superior court's authority to consider the objection would be very limited. This is dictated by the separation of powers doctrine that precludes courts from interfering with the executive decisions of prosecutorial authorities. (See *People* v. *Superior Court (Felmann)* 59 Cal.App.3d 270, 276 [130 Cal.Rptr. 548].) It is also clear from the constitutional provision itself which, at least in the first instance, vests the Attorney General with broad discretion in deciding when to prosecute. Accordingly, if the court may review the Attorney General's decision at all, it certainly may not interfere with that decision in the absence of a showing of a manifest abuse of discretion. This means two things, first, the burden is on the defendant to establish an abuse of discretion rather than on the Attorney General to justify the decision, and second, the Attorney General's decision must be upheld unless no reasonable person could reach the same conclusion.

▇▇▇ In moving to dismiss the indictment by reason of prosecution by the Attorney General, the defendant did not attempt to make any showing of an abuse of the discretion vested in the Attorney General; rather, his motion consisted of a challenge to the Attorney General to justify his decision. That alone is sufficient reason to reject defendant's objection.

In any event, the record provides ample justification for the Attorney General's decision. Contrary to assumptions implicit in defendant's argument, the constitutional provision does not require a pattern of inadequate enforcement before the Attorney General may decide to prosecute, nor does it require any finding of dereliction or recalcitrance upon the part of local prosecutors. Rather, it is sufficient that, in the Attorney General's opinion, "any law of the State is not being adequately enforced in any county." (Cal. Const., art. V, § 13.) As the Attorney General pointed out in opposition to defendant's motion to dismiss, this case lacks a clear situs and instead implicates several local jurisdictions. It involves an elected state constitutional officer in charge of a department with statewide jurisdiction. The DOE's primary offices are in Sacramento; QEP's corporate headquarters were in the Honig residence in San Francisco; the nominal contracting parties were the Fremont Unified School District, the Pasadena Unified School District and the Sweetwater Union High School District; and the subject employees worked in various other parts of the state. These factors made it difficult for, and unlikely that, a local prosecutor would take action

to enforce the law. Defendant engaged in these transactions over a prolonged period of time and yet it does not appear that any local prosecutor had stepped forward to investigate and enforce the law. There is nothing in the record to suggest that, after the discovery of the offenses by the Attorney General, any local prosecutor had indicated an intention to step forward to enforce the law. The fact is that, despite clear evidence of wrongdoing, in this case state law was not being adequately enforced without intervention by the Attorney General. These factors warranted the decision of the Attorney General to undertake prosecution and there was no abuse of discretion in that decision.

## V. *Restitution*

At defendant's initial probation and sentencing hearing, the trial court granted probation upon the primary conditions that he complete 1,000 hours of community service and that he make restitution in the amount of $337,590. Defendant was advised that the restitution order was preliminary and temporary and that he could contest the imposition and amount of the order. Defendant elected to contest the restitution order and after further hearing the court reduced the amount of restitution to $274,754. The orders for community service and for the payment of restitution were later stayed pending appeal. In staying the restitution order the court ordered that defendant shall pay 10 percent interest per annum on unpaid restitution until paid in full. Defendant raises a number of challenges to the restitution orders.[27]

In ordering restitution here the trial court rejected the recommendation of the probation officer. In his report the probation officer noted that the federal government had conducted an investigation and audit of the QEP contracts and had concluded that the contracts were in part funded with federal funds, that defendant engaged in violations of federal conflict-of-interest laws and had misused federal funds, and had demanded restitution from the state in the amount of $222,590, which demand was the subject of pending civil proceedings. The probation officer recommended that the issue of restitution be left to civil proceedings.

In rejecting the recommendation of the probation officer the court concluded that this was a case in which it was required to order restitution. (Former Pen. Code, § 1203.04, subd. (a); see Cal. Const., art. I, § 28, subd. (b).) The court's initial restitution order represented the full amount of the

---

[27]Defendant does not challenge his ability to make restitution. The prosecution presented evidence that defendant would have the ability to make the restitution ordered and, despite being advised that ability to pay was at issue and being invited to respond, defendant did not contest his ability to pay.

funds expended on the four contracts which gave rise to the four convictions. On further hearing the court deleted from the restitution order the funds attributable to the Sweetwater/Perondi contract.

Former Penal Code section 1203.04, subdivision (a)(1), provided that, unless compelling and extraordinary reasons exist otherwise, "the court shall require, as a condition of probation, that the person make restitution" to the victim if the crime involved a victim. Although this section was later repealed in 1995 (Stats. 1995, ch. 313, § 8), at the time of defendant's offenses and sentencing subdivision (d) of that section defined restitution as "full or partial payment for the value of stolen or damaged property, medical expenses, and wages or profits lost due to injury or to time spent as a witness or in assisting the police or prosecution, which losses were caused by the defendant as a result of committing the crime for which he or she was convicted." Defendant contends that the restitution order must be set aside because the losses suffered here do not come within the list of reimbursable losses in former Penal Code section 1203.04, subdivision (d).

The Attorney General retorts that the money spent by the state on the contracts in question constitutes "stolen" property within the meaning of subdivision (d) of Penal Code section 1203.04. Citing a legal dictionary, he notes that a well-recognized definition of "stolen" is: "Acquired, or possessed, as a result of some wrongful or dishonest act or taking, whereby a person willfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the intent to deprive the owner of the benefit of ownership (or possession) permanently." (Black's Law Dict. (6th ed. 1990) p. 1419.) Because defendant's conduct was wrongful, so the argument goes, the state expenditure constituted "stolen" property. Such a construction, it is claimed, is consonant with the rehabilitative purposes of restitution. Thus, the Attorney General argues that "it is reasonable to conclude that any loss resulting from a willful violation of section 1090 should fall within the scope of the word 'stolen' in Penal Code section 1203.04, since, as noted, restitution under this section is for rehabilitation."

The Attorney General's argument misses the mark. Defendant did not steal the funds in question; he caused them to be improperly expended on contracts in which he was financially interested. The funds in question were disbursed to the local school districts pursuant to the tainted contracts and then used to pay local school district employees for their contractual services. Defendant never "obtained" or "retained" possession of the funds. And, needless to say, the employees who actually received the funds did not steal them. Thus, even assuming that the cited dictionary definition properly defines the statutory meaning of stolen property, the funds in question

were not stolen even under that definition. (Cf. *Dowling* v. *United States* (1985) 473 U.S. 207, 218 [87 L.Ed.2d 152, 161, 105 S.Ct. 3127]; *United States* v. *Carman* (9th Cir. 1978) 577 F.2d 556, 564-565.) Moreover, even assuming there was some ambiguity about the meaning of the term "stolen," we would be required to resolve the ambiguity in favor of the defendant. "[W]hen language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. [¶] The defendant is entitled to the benefit of every reasonable doubt, whether it arise[s] out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute." (*In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553]; accord, *People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].) We therefore agree with defendant that the funds expended in this case did not constitute stolen property and consequently the trial court was neither authorized nor compelled to order restitution under the provisions of former Penal Code section 1203.04.

That does not mean, however, that the trial court lacked authority to order restitution as a condition of probation. Trial courts have long had discretion to order restitution as a condition of probation. As originally enacted in 1935, Penal Code section 1203.1 provided that when granting probation the court "may provide for reparation in proper cases" and "may impose and require . . . other reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from such breach and generally and specifically for the reformation and rehabilitation of the probationer." (Stats. 1935, ch. 604, § 2, p. 1708.) The term "reparation" has been construed to mean restitution. "The courts interpret the term *reparation* in section 1203.1 to mean reimbursement to the victims of crime for actual loss flowing from the charged offense or from related misconduct." (*People* v. *Baker* (1974) 39 Cal.App.3d 550, 559 [113 Cal.Rptr. 248], italics in original.) As presently amended, Penal Code section 1203.1 directs that "[t]he court shall provide for restitution in proper cases." (Pen. Code, § 1203.1, subd. (a)(3).) It further provides that "[t]he court shall consider whether the defendant as a condition of probation shall make restitution to the victim or the Restitution Fund." (Pen. Code, § 1203.1, subd. (b).) Finally, the statute continues to provide that the court "may impose . . . other reasonable conditions . . . ." (Pen. Code, § 1203.1, subd. (j).)

Thus, Penal Code section 1203.1 continues to vest the sentencing court with broad discretion in imposing considerations of probation, including restitution. Defendant would have us read former Penal Code section

1203.04 as a restriction upon the sentencing court's authority to order restitution as a condition of probation. This we may not do. Such a construction would have the effect of curtailing the trial court's preexisting discretion to order restitution as a condition of probation despite the fact that Penal Code section 1203.1 continues to vest the court with broad discretion over such matters, former Penal Code section 1203.04 expressly states that it is not to be construed as a restriction upon the court's probationary discretion, and the constitutional provision that section was intended to implement broadly proclaims a right of victims to restitution from wrongdoers. (Cal. Const., art. I, § 28, subd. (b).) As the California Supreme Court recently observed in *People* v. *Carbajal* (1995) 10 Cal.4th 1114, 1121 [43 Cal.Rptr.2d 681, 899 P.2d 67], "[r]estitution has long been considered a valid condition of probation." Given this historical authorization, the high court concluded "that nothing in Proposition 8 or in Penal Code section 1203.04 purports to limit or abrogate the trial court's discretion, under Penal Code section 1203.1, to order restitution as a condition of probation where the victim's loss was not the result of the crime underlying the defendant's conviction, but where the trial court finds such restitution will serve one of the purposes set out in Penal Code section 1203.1, subdivision (j)." (*Id.* at p. 1122.) It follows a fortiori that the sentencing court retains discretion to order restitution where the victim's loss is the result of the defendant's crimes.[28]

Nevertheless, because the trial court was under the misapprehension that restitution was mandatory, it did not exercise its discretion in deciding whether or not to impose restitution as a condition of probation under Penal Code section 1203.1. Accordingly, we shall remand the cause to the trial court to exercise its discretion and determine whether a condition of restitution should be imposed. Given the passage of time and the nature of the asserted loss to the state, it is also appropriate for the court to redetermine the amount of loss, if any, in the event it imposes a condition of restitution. As we have explained, it is not necessary that the defendant actually profit in order to violate section 1090. Similarly, a violation does not necessarily entail a "loss" on the part of the government. Since the trial court has not yet had the opportunity to exercise its discretion concerning restitution, we express no opinion whether on remand a further development of the record would support a finding of loss in this case.

In view of our remand, we do not address the remaining contentions concerning the restitution provision.

---

[28]Defendant contends that the state cannot be considered a "victim" that is entitled to restitution through a condition of probation. This question has now been settled contrary to his position. (*People* v. *Crow* (1993) 6 Cal.4th 952, 957-959 [26 Cal.Rptr.2d 1, 864 P.2d 80]; *People* v. *Narron* (1987) 192 Cal.App.3d 724, 732 [237 Cal.Rptr. 693].)

DISPOSITION

The condition of probation that defendant pay restitution is set aside and the cause remanded to the trial court with directions to exercise its discretion in determining whether to impose restitution as a condition of probation and, if so, to determine whether the state has suffered a loss and then redetermine the amount of any restitution. In all other respects the judgment of conviction and the order of probation are affirmed.

Blease, Acting P. J., concurred.

**NICHOLSON, J., Concurring and Dissenting.**—I agree with the majority opinion that the convictions are sound. I disagree concerning the order of probation—specifically, the order of restitution as a condition of probation. In my view, it should be affirmed.

Added to the California Constitution by Proposition 8, a 1982 initiative, article I, section 28, subdivision (b) mandates: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary." The constitutional amendment expressly required the Legislature to "adopt provisions to implement this section . . . ." (*Ibid.*)

In 1983, the Legislature acted on the constitutional mandate. It enacted former Penal Code section 1203.04, which, in 1993, provided: "In every case where a person is convicted of a crime and is granted probation, the court shall require, as a condition of probation, that the person make restitution . . . [t]o the victim . . . ." (Former Pen. Code, § 1203.04, subd. (a).) The statute went on to define "restitution" as "full or partial payment for the value of stolen or damaged property, medical expenses, and wages or profits lost due to injury or to time spent as a witness or in assisting police or prosecution, which losses were caused by the defendant as a result of committing the crime for which he or she was convicted." (Former Pen. Code, § 1203.04, subd. (d).)

The majority concludes the defendant did not steal the funds; instead, he caused them to be expended improperly. Furthermore, urges the majority, we cannot conclude the funds were stolen for the purpose of restitution under former Penal Code section 1203.04 because we must resolve any ambiguity

in favor of the defendant. This approach ignores the fundamental objective of statutory construction, that is, discovery of legislative intent.

The Supreme Court set the standard for interpretation of statutes effectuating Proposition 8. "Through the passage of Proposition 8, an initiative to reform the criminal justice system, the voters of the State of California amended the state Constitution to require the enactment of legislation providing that, unless 'compelling and extraordinary reasons' exist, restitution be ordered from any person convicted of a crime 'in every case . . . in which a crime victim suffers a loss . . . .' (Cal. Const., art. I, § 28, subd. (b).)" (*People* v. *Broussard* (1993) 5 Cal.4th 1067, 1077 [22 Cal.Rptr. 278, 856 P.2d 1134].)

In *Broussard*, the defendant pleaded guilty to two counts of receiving stolen property. He was sentenced to prison and ordered to pay $5,545 in restitution. He appealed, contending the trial court lacked the power to order him to pay restitution under Government Code section 13967, subdivision (c), the statute that governs orders of restitution when the defendant is sentenced to prison. (5 Cal.4th at p. 1069.) It requires the defendant to pay restitution to the "victim" for "economic loss." Former Government Code section 13960 defined a "victim" as "[a] person who sustains injury or death as a direct result of a crime."

Relying on the definition of "victim" in Government Code section 13960, the defendant asserted he could be ordered to pay restitution only for physical injury or death. (*People* v. *Broussard, supra,* 5 Cal.4th at p. 1070.) The Supreme Court rejected this interpretation. Instead, it found that the Legislature intended to follow its constitutional mandate to effectuate Proposition 8: "First and most important, as we have seen, the Legislature is under an express constitutional mandate (Cal. Const., art. I, § 28, subd. (b)) to enact laws requiring trial courts to order restitution 'in every case . . . in which a crime victim suffers a loss . . . .' This constitutional requirement makes no distinction between losses that result from physical injury and losses that are purely economic. Thus, unless the Legislature chose to ignore the obligation that the voters of California imposed on it through the passage of article I, section 28, subdivision (b) of the Constitution, it must have intended that [Government Code] section 13967 protect all crime victims, regardless of the nature of their loss." (*Id.* at p. 1075.) " 'The intent prevails over the letter, and the letter will, if possible, be read so as to conform to the spirit of the act.' " (*Id.* at p. 1071, quoting *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Accordingly, the court held that "injury" includes purely economic loss, without physical injury, associated with the defendant's crime of receiving stolen property. (*Id.* at pp. 1075-1077.)

As did the *Broussard* court with respect to Government Code section 13697, subdivision (c), we must interpret former Penal Code section 1203.04 to conform to the constitutional mandate of California Constitution, article I, section 28, subdivision (b), because there is no indication the Legislature intended to ignore, even if it could, this express constitutional obligation. (See *People v. Broussard, supra,* 5 Cal.4th at p. 1075; see also *People v. Cruz* (1996) 13 Cal.4th 764, 784-785 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Doing so, I conclude that the term "stolen property," as used in former Penal Code section 1203.04, subdivision (d) includes property wrongfully appropriated as a result of felony conflict of interest. Indeed, "to steal," in a broad sense, is defined in the Oxford English Dictionary as taking or appropriating dishonestly anything belonging to another, whether material or immaterial. When an appropriation is made in violation of the conflict of interest laws, it is dishonest as a matter of law. There is no indication the Legislature intended the term "stolen property" to refer to any of an assortment of narrower definitions used in the theft and receiving stolen property statutes.

The majority avoids this analysis by incanting the rule of lenity—that we must interpret an ambiguous criminal statute in favor of the defendant. However, if we are to construe former Penal Code section 1203.04 the way the Legislature intended it, that is, as an effectuation of Proposition 8, then we must construe "stolen property" to include funds improperly appropriated due to a conflict of interest. This precludes interpretation of "stolen property" in favor of the defendant. The rule of lenity "applies only when some doubt exists as to the legislative purpose in enacting the law" (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1046 [36 Cal.Rptr.2d 74, 884 P.2d 1022]) and must yield when it collides with legislative intent. (*People v. Phelps* (1996) 41 Cal.App.4th 946, 951 [48 Cal.Rptr.2d 855].) Here, there is no doubt concerning legislative intent. Indeed, if the rule of lenity could be invoked to defeat legislative intent, a skillful semanticist could nullify any penal statute by confining each constituent word or phrase to its narrowest sense in favor of the defendant.

In 1995, the Legislature repealed former Penal Code section 1203.04 and amended section 1202.4 to provide, in part: "Restitution shall, to the extent possible, be of a dollar amount that is sufficient to fully reimburse the victim or victims, for *every determined economic loss* incurred as a result of the defendant's criminal conduct, including all of the following: [¶] (1) Full or partial payment for the value of stolen or damaged property. . . ." (Stats. 1995, ch. 313, §§ 5 & 8, italics added.) This clarifies that the legislative intent was to reimburse for all economic loss, not just for "stolen property," narrowly construed. (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1059 [1 Cal.Rptr.2d 195] [subsequent amendment of a statutory scheme may be

clarification of legislative intent].) Accordingly, in my view, former Penal Code section 1203.04 provided for mandatory restitution in this case for the state's losses.

The defendant contends the evidence does not support the trial court's conclusion the state actually suffered a loss as the result of the QEP contracts. In reaching that conclusion, the court correctly recognized restitution can be ordered only upon a finding, by a preponderance of the evidence, of loss caused to the victim by the defendant's conduct. (*People* v. *Baumann* (1985) 176 Cal.App.3d 67, 80 [222 Cal.Rptr. 32].) The court found, as a proven fact, the state suffered loss. The court's finding is supported by substantial evidence.

Stripped to their essentials, these contracts are simple. The defendant ordered his staff, over the vigorous objection of his deputy, James Smith, to arrange for the state to pay funds to certain school districts that were not expected to, and did not, do anything other than serve as conduits for the payment of the salaries of individuals who worked for a private corporation. In order to avoid such things as competitive bidding, Department of General Services oversight, and the like, the contracts were set up with the school districts as named contractors and assigned fictitious local duties that were never intended to be performed by the districts. As the trial court found, the school districts, as the defendant fully intended, did nothing more than float the funds to employees hired by QEP before the contracts were made.

Because Page, Dunbar and Law worked for QEP and QEP donated services to some school districts, the defendant asserts it must be concluded the state derived benefit from the contracts and thus did not suffer a loss. To the contrary, article IX, section 6, of our state Constitution provides that no part of the public school system shall be, directly or indirectly, transferred from or placed under the jurisdiction of any authority other than one included in the public school system. By arranging to keep Page, Dunbar and Law on the payroll of the public school system while they worked exclusively for QEP (free from any direction or control by any part of the public school system), defendant violated this provision. Article XVI, sections 3 and 6 of the Constitution preclude state officials from using any state money for the benefit of any corporation or from making any gift or grant of public funds to private corporations. Regardless whether QEP donated services to school districts not identified in the contracts, the compensation of its employees was its responsibility. By arranging to use state funds for the payment of compensation to QEP's employees while they were in the sole employ of QEP, the defendant violated these provisions.

The evidence shows the defendant collected rent from QEP and his wife collected a salary. In other words, they received income from QEP. During

the investigation, the defendant stated: "I'll stipulate that it helped out on our income." This use of improper contracts to take money from the Department of Education and turn it into income for himself is akin to money laundering. (See *U.S. v. Parlavecchio* (D.N.J. 1995) 903 F.Supp. 788, 796.)

In *Parlavecchio*, the defendants were employed by the city board of education. They established a corporation, thus concealing their individual identities, and bought property for the corporation which was later leased to the board for use as an elementary school. In effect, the defendants received rental payments from the board in violation of the conflict of interest laws. (903 F.Supp. at pp. 789-790.) The federal district court upheld their indictment on money laundering charges because "the defendants caused transfers of rent checks from the Board to specified bank accounts held by [the corporation] and then caused transfers from [the corporation's] accounts to specified accounts held by each defendant," the latter transfer constituting money laundering. (*Id.* at p. 796.)

The defendant directed the Department of Education's employees to process unusual contracts with the districts. Donna Salaj, an experienced contracts manager for the department, had never seen contracts in which money was paid to a school district with directions to the district to pass the money along to a private company. Peter Yasitis, assistant superintendent of business for the Fremont Unified School District, had never seen the department fund a school employee to work for a private corporation. The defendant not only ordered these contracts for the benefit of QEP, he also solicited private funding for QEP, which he did not do for QEP's competitors. The evidence is clear the defendant used his position to issue contracts in favor of QEP and then collected income from QEP. As did the money launderers in *Parlavecchio*, the defendant set in motion masked expenditures of public money which inured eventually to his personal benefit.

Whenever public funds are to be expended, there are substantive and procedural requirements that must be scrupulously honored. These include statutory or regulatory authorization for the expenditure and compliance with procedural requisites such as competitive bidding and advertisement and invitation to apply for funds pursuant to legally established grant programs. In the case of federal funds, expenditures must be made under the auspices of the State Board of Control pursuant to regulations established by that board. (Ed. Code, § 12000 et seq.) Any transaction by which a local school district acquires federal funds must be made pursuant to regulations established by the Superintendent of Public Instruction. (Ed. Code, §§ 33113-33114.) Here, that did not happen. Instead, over the objections of his staff, the defendant knowingly expended public funds without authority,

ignored mandatory legal procedures, and utilized illegal contracts crafted carefully to conceal their true nature. Our law considers such behavior a misappropriation of public funds and attaches felony consequences. (Pen. Code, §§ 424-425; *People* v. *Battin* (1978) 77 Cal.App.3d 635, 650-651 [143 Cal.Rptr. 731, 95 A.L.R.3d 248].)

Just as Government Code sections 1090 and 1097 were designed to ensure absolute and undivided loyalty by public officials, these constitutional and statutory provisions, and others, were designed to ensure absolute protection of the public fisc. Public funds can be expended only pursuant to duly established authority and only in a manner that will ensure public control and accountability over the expenditure. While the defendant asserts the state received some benefits from the expenditures, the state is not in a position to ascertain or measure any asserted benefits because the defendant arranged and executed these contracts with the intent to preclude any form of public accountability. He succeeded for a time. When public funds are expended by a public official in an unauthorized manner and without complying with procedural requisites designed to ensure public control and accountability over the expenditure, then the expenditure must be considered a loss to the state. Accordingly, substantial evidence supports the trial court's finding that the state suffered financial loss as a result of the defendant's behavior.

I would uphold the trial court's restitution order as an appropriate application of former Penal Code section 1203.04.

Even accepting, for the purpose of argument, the majority's conclusion that restitution is not mandated by former Penal Code section 1203.04 *and* the trial court did not exercise its discretion to order restitution under Penal Code section 1203.1, any procedural error was harmless.

"No judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Despite this constitutional mandate, the majority fails to perform a harmless error analysis.

In ordering restitution, the trial court relied on former Penal Code section 1203.04, which makes restitution mandatory, regardless of the purpose of restitution. When imposing restitution under former Penal Code section 1203.04, there is no reason to consider the purpose of restitution because it must be imposed, absent compelling and extraordinary circumstances. Yet, the court continued: "Furthermore, in [*People* v. *Narron* (1987) 192

Cal.App.3d 724 (237 Cal.Rptr. 693)], the Court stated that restitution has value beyond victim recovery of actual losses. Restitution additionally serves the purpose of deterring future criminality and rehabilitating the criminal. All of these aims are effectively served when the government is compensated for its actual losses through the receipt of Penal Code section 1203.04 restitution. [Citation.] The Court finds that all three purposes will be served by ordering the defendant to pay restitution to the state in this case."

The primary aims of a restitution order under Penal Code section 1203.1 are (1) compensation to the victim, (2) deterrence of future criminality, and (3) rehabilitation of the criminal. (*People* v. *Narron* (1987) 192 Cal.App.3d 724, 732 [237 Cal.Rptr. 693].) Accordingly, these are the three considerations that go into the trial court's decision concerning whether to order probation.

During the hearing on restitution, the court commented: "[T]he law is perfectly clear that a court for reformation and for deterrence can, in fact, order restitution." Despite the trial court's statements that restitution was mandatory under former Penal Code section 1203.04, it went beyond those statements in its order to note the purposes for restitution would be served.

Furthermore, the trial court was aware of the mandate contained in California Constitution, article I, section 28, subdivision (b) giving victims the right to restitution. It stated: "California law requires that the Court order restitution for the actual loss experienced by the state. Restitution shall be ordered from convicted felons in every case in which the victim suffers loss, unless compelling and extraordinary reasons exist to the contrary. (See Cal. Const., art. I, § 28 (b).)"

A review of the entire case reveals no reasonable doubt the trial court would have ordered restitution under Penal Code section 1203.1 if it believed such an order was not appropriate under former Penal Code section 1203.04. There is no reasonable probability of an outcome more favorable to the defendant on remand. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Therefore, the restitution order should be affirmed.

A petition for a rehearing was denied September 4, 1996.